# Illinois Official Reports

## Appellate Court

---

### *People v. Carter*, 2017 IL App (1st) 151297

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HOWARD CARTER, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-1297 |
| Filed | December 28, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 95-CR-31813; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Maria A. Harrigan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Heather Fahrenkrog, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices McBride and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Howard Carter appeals the third-stage dismissal of his postconviction petition.

¶ 2     Following a bench trial, defendant was convicted of two counts of first-degree murder, one count of attempted murder, and one count of aggravated discharge of a firearm. After hearing factors in aggravation and mitigation, the trial court sentenced defendant to a term of natural life imprisonment in the Illinois Department of Corrections (IDOC) for the two murder convictions and to a consecutive sentence of 15 years' imprisonment for attempted murder. On March 11, 2002, we affirmed defendant's convictions but modified his 15-year sentence to run concurrently with his life sentence, rather than consecutively. *People v. Carter*, No. 1-99-2230 (2002) (unpublished order under to Illinois Supreme Court Rule 23).

¶ 3     Defendant then filed a *pro se* petition for postconviction relief, alleging multiple claims of ineffective assistance of trial counsel. Defendant's postconviction petition proceeded to a second-stage review where court-appointed counsel filed (1) an amended petition, claiming that he is actually innocent and that his trial counsel was ineffective by preventing him from testifying at trial and (2) affidavits from two eyewitnesses who swore that defendant was not present at the time of the shooting and that someone else had shot the victims. The trial court dismissed the petition, finding that it was untimely, that it was not meritorious, and that defendant forfeited the issue regarding his right to testify. On appeal, we reversed the trial court's second-stage dismissal and remanded for a third-stage evidentiary hearing on defendant's claim of actual innocence. *People v. Carter*, 2013 IL App (1st) 110046-U. On remand, the trial court heard new testimony and determined that the newly discovered evidence would not change the result on retrial.

¶ 4     On this appeal, defendant claims that the trial court erred and that he is entitled to a new trial because the newly discovered testimony of Antonio McDowell and Vaughn Peters implicates another man in the shooting, and thus would likely change the result on retrial. For the following reasons, we affirm.

¶ 5                                    BACKGROUND

¶ 6     At trial, the State argued in its opening that, on October 22, 1995, defendant raised a gun and fired multiple shots into a vehicle, killing two of the three occupants. The deceased were Devol Scott and Patrick Davis. The third occupant was Allen Williams. During its opening statement, the defense claimed that defendant did not shoot the victims and that he was incapable of firing a gun due to a hand injury. At trial, the State presented 10 witnesses, including the surviving victim, who identified defendant as the shooter. The trial court asked defendant whether he knew he had a right to testify and whether he was choosing to exercise his right not to testify, and defendant answered affirmatively. In his postconviction petition, defendant claimed that his trial counsel prevented him from testifying and that he is actually innocent. He supported his claims with the affidavits of two eyewitnesses who also were not called to testify at trial.

¶ 7                          I. Kenneth Beecham's Testimony at Trial

¶ 8     At trial, the State called Kenneth Beecham, who testified that he is a former member of the Undertaker Vice Lords street gang. In October 1995, he had been a member of the gang for

four years and had achieved the rank of "Prince," which is the second-in-command to the "Chief." The gang was divided into two factions, separated by age, with the "Fifth Generation" consisting of members in their mid-20s to 30 years old and the "Sixth Generation" composed of members under the age of 21. Beecham was a member of the Sixth Generation. Devol Scott, Beecham's cousin and best friend, was the chief of the Sixth Generation.

¶ 9    Beecham testified that the Fifth and Sixth Generations were "at war" with each other. Defendant, known as "Duck," was the chief of the Fifth Generation, but defendant did not bear any ill-will against Beecham. Despite the feud between the two generations, defendant and Scott remained friends and met with each other daily. Defendant frequently spent time near the intersection of Ferdinand Street and Lockwood Avenue in Chicago.

¶ 10    Beecham testified that, in May 1995, defendant was shot multiple times, including in his right hand, and that defendant blamed members of the Sixth Generation for the shooting. After defendant was released from the hospital, he had to exercise his hand until he regained strength, though he was able to shake hands normally. Neither Beecham nor Scott ordered the shooting of defendant. On October 17, 1995, defendant told Beecham that a man known as "Mike-Mike" was the person that had shot him. Mike-Mike, a member of the Sixth Generation, was a friend of both Beecham and Scott.

¶ 11    Beecham testified that, on October 21, 1995, he was accompanied by Allen Williams and Scott at the home of Patrick Davis. At the time, Allen Williams was a prince of the Fifth Generation, and Patrick Davis was a member of another gang, the "Gangster Disciples." While they were visiting, the three men spoke with defendant, who asked them if they were going to take his side in the dispute with the members of the Sixth Generation. Scott replied that he had nothing to do with defendant's feud, and defendant responded that he was going to kill the Sixth Generation. Defendant asked the three men to help him seek revenge on Mike-Mike, but they refused and then left.

¶ 12    On October 22, 1995, Beecham spent the day with Williams and Scott. Around 7 p.m., they drove to the west side of Chicago and dropped off Beecham at his girlfriend's residence. He later learned that Scott had been shot to death. On October 24, 1995, Beecham and Williams went to the police station to talk with the police. The next day, Beecham became employed and told his fellow gang members that he quit the gang.

¶ 13                     II. Allen Williams's Testimony

¶ 14    Allen Williams, the attempted murder victim, testified that he had been a member of the Undertaker Vice Lords for 13 years. The gang was divided into generational factions separated by age. Williams belonged to the Fifth Generation, which consisted of members between the ages of 20 and 25. Williams had obtained the rank of prince in the Fifth Generation, just below the rank of "King." Defendant, known as "Chief Duck," was the leader of the Fifth Generation. Paul Carter, also known as "Weasel," was defendant's brother and a member of the Fifth Generation. Williams's half-brother and friend, Devol Scott, was the king of the Sixth Generation. Kenneth Beecham was a friend of Williams and the prince of the Sixth Generation. Patrick Davis, also a friend of Williams, was a member of another gang, the Gangster Disciples. Williams did not know Tyrone Randolph.[1]

_____

[1]Randolph initially told the police and testified before a grand jury that he was an eyewitness to the murders, but recanted at trial.

¶ 15 Williams testified that defendant had a personal feud with a man known as Mike-Mike, a member of the Sixth Generation, who had shot defendant in the hand. Defendant wanted revenge against Mike-Mike and felt that the Sixth Generation gang was responsible for the shooting. Williams had heard defendant state on a previous occasion that he was going to kill members of the Sixth Generation. Though members of the Fifth and Sixth Generations had been fighting with each other, other members of the Sixth Generation were not involved in the dispute with defendant.

¶ 16 Williams testified that, on October 21, 1995, he, Scott, and Beecham visited Davis's home. The three approached defendant, who was also visiting, and defendant asked them if they were going to help him seek revenge against the Sixth Generation members that were involved in his shooting. Scott replied that he, Williams, and Beecham were not involved in defendant's feud. In response, defendant shook his head and said, "Alright, that's cool."

¶ 17 Williams testified that, at 8 p.m. the next day, he and Scott were in their neighborhood near Cicero Avenue and Quincy Street in Chicago, when they learned that defendant's brother had been shot and killed. Scott drove them in Williams's mother's vehicle to pick up Davis at his home. Davis entered the vehicle and sat in the backseat. The three men wanted to offer their condolences to defendant in light of his brother's death, so Scott drove them to the intersection of Ferdinand Street and Lockwood Avenue, where they encountered a man called "Romy," a member of the Fifth Generation gang. Williams asked Romy where they could find defendant, and Romy pointed them to an area in the middle of the block. As Scott drove drown Ferdinand Street, Williams observed defendant standing near the street with five or six fellow gang members.

¶ 18 Williams testified that Scott drove within 15 feet of defendant, who then raised a 9-millimeter pistol and opened fire on the vehicle. Williams ducked in the passenger's seat and heard several gunshots as Scott drove away from defendant. After a short distance, the vehicle crashed into the back of a van and came to a stop. When Williams attempted to pull Scott to the floor of the vehicle and into his lap, he observed bullet holes in Scott's head and neck. As Williams attempted to exit the vehicle, he heard several more shots being fired into the passenger-side door and window, so he shielded himself underneath the dashboard. Once the gunfire stopped, three men pulled Williams from the vehicle and told him that the gunman was gone. The shooting took place over a span of four to six minutes, and more than 10 gunshots were fired. The police arrived at the scene two minutes after the shooting stopped. Williams refused to talk to the police at first because he felt betrayed and angry and wanted to personally seek revenge on defendant.

¶ 19 Williams testified that two days after the shooting, he decided that the right thing to do was to talk to the police, so he and Beecham drove to the police station together. Williams told detectives that Scott was driving him and Davis on Laramie Avenue, when they observed defendant and several others standing near Ferdinand Street. Williams told Scott to drive the vehicle over to where the men were gathered. As the vehicle approached, defendant jumped back about two feet from the vehicle, raised a 9-millimeter gun, and fired several shots at the vehicle from a distance of 15 feet.

¶ 20 III. Identification Testimony of Tyrone White and Patricia Scott

¶ 21 Tyrone White testified that Patrick Davis was his cousin, and that he had last observed him alive on October 20, 1995. A few days later, White learned that his cousin was dead. Patricia

- 4 -

Scott testified that Devol Scott was her son, and that she had last observed him alive on October 22, 1995. Later that evening, the police told her that her son had died.

¶ 22                        IV. Detective Richard Maher's Testimony

¶ 23    Detective Richard Maher testified that he is a detective with the Chicago police department and has been a policeman for 12 years. On October 22, 1995, he was assigned to investigate a homicide near the intersection of Quincy Street and Cicero Avenue in Chicago. The victim in that case was defendant's brother, Paul Carter. Later that evening, Maher was assigned to investigate another homicide on the 5200 block of West Ferdinand Street. When Maher arrived at the crime scene at 9:10 p.m., he observed two ambulances, each containing one victim from the shooting. Maher identified one of the victims as Devol Scott. The other victim was identified the next day as Patrick Davis. Maher learned that a witness, Allen Williams, had been transported from the scene to the Area 5 Detective Division.

¶ 24    Maher testified that he inspected the crime scene and found 11 spent shell casings and a bullet fragment from a 9-millimeter gun. Further down the street where a vehicle had crashed, he found seven additional 9-millimeter shell casings. He observed a bullet hole in the windshield of the vehicle, and all of the side windows except the front passenger-side had been shattered. Maher inspected the inside of the vehicle and found five fired bullets lodged into its interior.

¶ 25    Maher testified that he interviewed Williams at the Area 5 Detective Division later that evening, and Williams told him that he did not observe who shot at the vehicle. On the morning of October 25, 1995, Williams returned to the police station, and Maher interviewed him a second time. Williams changed his story and told Maher that he did in fact observe the shooter, and identified him as a man known by the nickname "Duck." Maher presented Williams with a photograph of defendant, and Williams identified defendant as the shooter. After he interviewed Williams, Maher drove to the Forest Park neighborhood in Chicago and arrested defendant.

¶ 26    Maher testified that Detective Carothers told him that a man in custody, Tyrone Randolph, was an eyewitness to the shooting. Maher interviewed Randolph later that evening, and Randolph told him that he observed two men shooting at the vehicle and that one of the shooters was defendant.

¶ 27                        V. Officer Jackie Campbell's Testimony

¶ 28    Officer Jackie Campbell testified that she was an officer in the Chicago police department. On the afternoon of October 24, 1995, the police arrested Tyrone Randolph for a drug offense and brought him to the Fifteenth District police station. As Randolph was sitting in an interview room, he called out to Campbell and told her that he had information about two murders. Randolph described the location of the shootings, and Campbell recognized the murders as the two that occurred on October 22, 1995. She told Randolph that she could not do anything for him, but that she would contact a detective to speak with him. She spoke with Detective Carothers and told him that there was a suspect in custody at the police station that claimed to have information about two murders.

¶ 29                          VI. Detective Carothers's Testimony

¶ 30    Detective Carothers testified that he has been a detective with the Chicago police department for three years and was assigned to investigate the murder of defendant's brother. On October 24, 1995, Carothers received a telephone call from Campbell, and she told him that a man named Tyrone Randolph was in custody on a drug charge and that he claimed to have information about the shooting. Carothers told her that he would drive over to the police station to interview the suspect.

¶ 31    Carothers testified that he arrived at the Fifteenth District police station to speak with Randolph later that evening. Randolph told him that he had information regarding the murder of defendant's brother and that he was an eyewitness to the shooting deaths of Scott and Davis. Randolph asked Carothers if he could arrange a deal on his pending charges, but Carothers told him that he needed to hear the information first. Randolph then told Carothers that he had witnessed gunmen fatally shoot defendant's brother, who Randolph knew as Weasel, in the west alley of Cicero Avenue near its intersection with Quincy Street. He also told Carothers that, later that night, he observed defendant, known as Duck, fire several shots at a vehicle near the intersection of Ferdinand Street and Lockwood Avenue.

¶ 32    Carothers testified that, after this initial conversation, he took Randolph back to an interview room so he could provide a more thorough accounting of the events. Also present during the interview were Assistant State's Attorney (ASA) James Sanford and Detective John McMurray, who was assigned to investigate the murder of defendant's brother. As Randolph described the shootings in more detail, Carothers took notes and reported the information in a general progress report. He referred to Randolph as a confidential informant because Randolph was concerned that, as a high-ranking member of the "Mafia Insane" street gang, he could face retaliation for providing information to the police.

¶ 33    Carothers testified that Randolph stated that, around 7 p.m. on October 22, 1995, he observed defendant's brother running down the block of 210 South Cicero Avenue. A person following him raised a gun and shot at him. Another person appeared, and both offenders walked up to defendant's brother and shot him numerous times as he lay on the ground.

¶ 34    Carothers testified that Randolph told him that, after witnessing the murder, he went looking for defendant to find out if he had heard about his brother's death. Randolph found defendant at the intersection of Ferdinand Street and Lockwood Avenue. Defendant was with several other black men, but the only person he recognized other than defendant was a man named "Von." After he spoke with defendant, a vehicle pulled up to defendant, and Randolph heard him say, "I'm going to get those n***," and "it's going to get ugly now." Defendant then raised a gun and fired numerous shots at the vehicle. Randolph did not describe the type of gun and said that he left the scene during the shooting.

¶ 35    Carothers testified that Randolph promised that he would seek out additional information about the other shooting once he learned the names of the other men who were present at the scene. However, Randolph requested to be released first because he could not learn any new information while in custody. Carothers did not grant Randolph's request, and Randolph then told him that he refused to provide any further information about either of the shootings. Randolph again asked for a deal on his pending charges, and Carothers told him that he could not discuss it.

¶ 36                    VII. ASA Mike Goldberg's Testimony

¶ 37    ASA Mike Goldberg[2] testified that he and Carothers met with Randolph on October 25, 1995. Goldberg gave Randolph *Miranda* warnings, and Randolph repeated the information he had about the two murders. Goldberg memorialized the information in a written statement and read the statement back to Randolph to make sure it was accurate, and all three men signed it. Randolph told Goldberg that the police treated him fine and that they did not threaten him to obtain the statement.

¶ 38                    VIII. ASA James Sanford's Testimony

¶ 39    ASA James Sanford testified that he was assigned to Judge Dennis J. Porter's courtroom in 1996 and was the first chair for the homicide trial of defendant's brother. The offenders in that case were Dante Branch and Alfonso Caldwell. Sanford was not assigned to defendant's case, which was in Judge James D. Egan's courtroom with a different ASA. Sanford learned from Detective Carothers's general progress notes that a confidential informant had provided information about the murder of defendant's brother.

¶ 40    In the fall of 1996, the attorneys representing Branch and Caldwell filed a motion for the State to disclose the name of the confidential informant. Sanford then met with Carothers, who told him that Randolph was the informant. Sanford then arranged for an interview with Randolph, who was still in custody. Carothers and Detective John McMurray, who was assigned to investigate the Paul Carter homicide, were also present for the interview.

¶ 41    Randolph repeated the same information regarding the murders that he had previously told to Carothers. Sanford had a limited discussion with Randolph about making a deal, and he offered to drop one of Randolph's three pending drug cases in exchange for his testimony concerning the shooting death of defendant's brother. No offer was made to Randolph to testify in defendant's case. The interview ended abruptly when Sanford told Randolph that he could not drop the drug charge until after Randolph testified.

¶ 42    Sanford later arranged a second meeting with Randolph in an attempt to convince him to accept his offer to drop the drug charge after Randolph testified. However, Randolph would not even speak to Sanford. The murder case went to trial, and Randolph did not testify. In April 1997, Randolph pled guilty to all three of his pending drug charges and was sentenced to 12 years in IDOC.

¶ 43                    IX. Tyrone Randolph's Testimony

¶ 44    At trial, Tyrone Randolph testified that he did not know defendant. Randolph was a member of the Mafia Insane Vice Lords, which is a faction of the Vice Lords street gang. The Mafia Insane Vice Lords are not affiliated with the Undertaker Vice Lords, and the two gangs were feuding with each other. Despite testifying that he did not know defendant, Randolph testified that he knew defendant was a member of the Fifth Generation of the Undertaker Vice Lords gang. Randolph had also observed defendant in jail, and he identified defendant in court.

¶ 45    The State then attempted to refresh Randolph's recollection with his grand jury testimony.[3] Randolph testified before a grand jury that, at 9 p.m. on October 22, 1995, he was walking

---

[2]ASA Goldberg testified that his first name was "Mike."

[3]As we observe below (*supra* ¶ 50), Randolph's grand jury testimony was admitted into evidence.

down Ferdinand Street in Chicago when he observed defendant exiting a vehicle with another man. Randolph approached defendant and informed him that his brother, Weasel, had been murdered. Defendant responded that he had heard the news and that he was "fitting to address the business." Randolph then left defendant and continued walking down Ferdinand Street. At that time, he observed a vehicle drive up to defendant. Both defendant and the other man pulled out black 9-millimeter guns and began shooting at the oncoming vehicle. Randolph observed the shooting for 20 seconds until he left the scene. Randolph testified before the grand jury that he was treated well and not threatened by the State's Attorney or the police.

¶ 46    At trial, Randolph testified that he remembered his grand jury testimony, but claimed that his story was a lie. Randolph did not remember being near the intersection of Ferdinand Street and Lockwood Avenue on October 22, 1995, and did not know anything about the shooting.

¶ 47    Randolph testified that ASA Garfinkel, who presented him to the grand jury, threatened him. The State presented Randolph with the written statement that he gave to ASA Goldberg on October 25, 1995. Randolph testified that he did not recognize his signature on the statement and denied ever reading it or knowing what it said.

¶ 48    Randolph testified that he was currently serving 12 years for multiple drug offenses. One of the offenses resulted from an incident on October 24, 1995. That day, Randolph was arrested and taken to the Fifteenth District police station, where Detective Curley[4] questioned him. Randolph did not tell Curley anything about defendant or defendant's brother. Curley told him that the police would drop the drug case against him if he helped them. Curley asked Randolph about the murders in his area because he knew that Randolph was the chief of the Mafia Insane Vice Lords. Even though Randolph did not have any information on the shootings, he accepted Curley's offer. Curley then placed cocaine in front of Randolph and told him that he would face another drug charge if he did not provide Goldberg an eyewitness account of the shootings. Curley then told Randolph exactly what to say and instructed him on how to answer the questions.

¶ 49    Randolph testified that he had lied to the grand jury because Curley threatened to falsely charge him with possession of six ounces of cocaine if he did not cooperate. After he testified before the grand jury, Randolph told Curley and the ASA that he would not lie anymore. At that point, he chose to reject their offer of dropping all of his pending cases in exchange for testifying to a fabricated story about the shootings. Instead, Randolph chose to plead guilty and serve a 12-year sentence.

¶ 50    Detective Curley did not testify at trial. The following was admitted into evidence: (1) the transcript of Randolph's testimony before the grand jury, (2) the postmortem examination reports and medical examiner's photos of Scott and Davis, and (3) all of the bullets recovered from both bodies. The parties additionally stipulated that the two bullets recovered from Scott's body, the five bullets recovered from Davis's body, and the one bullet recovered from the scene of the crime were all 9-millimeter bullets, but the results of the Illinois State Police crime lab's tests were inconclusive as to whether one or more guns were used in the shooting because the police did not recover a gun to compare with the bullets.

¶ 51    The State rested, and the trial court denied defendant's motion for a directed finding. The defense then rested. The trial court asked defendant whether he understood that he had a right

---

[4]Detective Curley's first name does not appear in the appellate record.

to testify and whether he was exercising his right not to testify, and he replied affirmatively. The following exchange occurred:

> "THE COURT: *** Mr. Carter, your attorney is stating that you are resting. Do you understand you have a right to testify? You also have the right not to testify?
>
> DEFENDANT: Yes, [Y]our Honor.
>
> THE COURT: And you are exercising your right not to testify?
>
> DEFENDANT: Yes, I am, [Y]our Honor."

¶ 52                           X. Closing, Conviction, and Sentencing

¶ 53     During closing arguments, the defense claimed that neither Williams's nor Randolph's testimony was credible. Following closing arguments, the trial court found defendant guilty on both counts of first-degree murder, one count of attempted first-degree murder, and one count of unlawful discharge of a firearm. After considering factors in aggravation and mitigation, the trial court sentenced defendant to a term of natural life imprisonment for the two murders, and to a consecutive term of 15 years' imprisonment for the attempted murder.

¶ 54                    XI. Direct Appeal and Postconviction Proceedings

¶ 55     Defendant appealed his convictions and sentence, claiming that the State failed to prove him guilty beyond a reasonable doubt and that his sentence was excessive and violated his due process rights under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). We affirmed defendant's convictions but modified his consecutive sentences to run concurrently. In affirming defendant's convictions, we found that "[t]he trial court considered Randolph's credibility as well as the circumstances surrounding his testifying and determined that the grand jury testimony was believable while the in-court testimony was not. The trial court also determined that Williams'[s] explanation for changing his story was reasonable." *Carter*, No. 1-99-2230, slip order at 6-7. Defendant's petition for leave to appeal was denied on October 2, 2002. *People v. Carter*, 201 Ill. 2d 580 (2002) (table).

¶ 56     As noted, on July 28, 2005, defendant filed a *pro se* petition for postconviction relief. Defendant's postconviction petition proceeded to a second-stage review, and court-appointed counsel filed an amended petition on March 18, 2010. In his amended petition, defendant claimed that his trial counsel was ineffective for not allowing him to testify at trial. Defendant claims that he would have testified that he was not present at the time of the shooting and that he was incapable of firing a gun due to a hand injury. Defendant also claimed actual innocence based on affidavits of two newly discovered eyewitnesses, Antonio McDowell and Vaughan Peters, who swore that defendant was not present at the time of the shooting and that another man had shot at the victim's vehicle. Defendant also claimed that he was not culpably negligent for filing his petition late because he relied on his counsel on direct appeal to either file his petition for him or provide him with filing deadlines.

¶ 57     In his affidavit, McDowell swore that he observed a man known as "Volli" shoot the victims, and that defendant was not present at the time of the shooting. In 1995, McDowell was a member of the Undertaker Vice Lords gang, and he knew defendant, Williams, Scott, Davis, and Randolph. On October 22, 1995, McDowell spent time with defendant, then with Scott, and later with Scott and Davis at Davis's home. Later that evening, McDowell was standing with several other members of the Undertaker Vice Lords gang near the intersection of

Ferdinand Street and Lockwood Avenue. He did not observe defendant or Randolph, who was a member of the rival Mafia Insane Vice Lords gang, on the corner.

¶ 58     McDowell observed Scott in the front seat of a vehicle stopped on Ferdinand Street, but he was unable to observe the other passengers. As Scott drove the vehicle toward the group of men, Volli appeared from behind a tree, pulled a bandana up to cover his face, and fired at the vehicle several times. McDowell fled during the shooting, but later came back to determine who had been shot. He never told the police what he observed. Sometime later, McDowell was convicted of first-degree murder, attempted murder, and aggravated vehicular hijacking—all unrelated to the shooting in the instant case—and was sentenced to prison terms of 59, 29, and 15 years, respectively. In 2003 or 2004, he learned that defendant had been convicted of the murders of Scott and Davis. While he was incarcerated, McDowell met defendant at a prayer meeting at the prison where both were confined and told defendant that he observed Volli shoot the victims.

¶ 59     Vaughan Peters also swore in his affidavit that defendant was not present during the shooting. In 1995, Peters was a member of the Undertaker Vice Lords. On October 22, 1995, he learned that defendant's brother had been killed. Peters then drove to Ferdinand Street between Lockwood Avenue and Laramie Avenue, but defendant was not there when he arrived. While he was at Ferdinand Street and Lockwood Avenue, Peters called defendant to offer his condolences.[5] Defendant was at the home of his girlfriend, Lyda, during the telephone conversation.

¶ 60     Peters observed several other gang members standing on the corner, including Volli, who was drunk and "acting crazy." Randolph, a member of the rival Mafia Insane Vice Lords gang, was not on the street. As Peters walked away from the group of men, he heard a gunshot. He turned and observed Volli holding a gun.[6] As Peters ran away, he heard several more shots being fired, and he left the neighborhood. A day or two later, Peters learned that Scott had been shot to death on Ferdinand Street and that defendant had been arrested for the murder. Peters then left town. He did not talk with the police about what he observed because he thought that defendant would be released, since "everybody knew" that defendant was not there. Peters was incarcerated in 1996 and released in 2005. Peters is currently serving a four-year sentence for unlawful possession/use of a weapon by a felon. A photograph of Volli was attached to both affidavits.

¶ 61     The trial court dismissed defendant's postconviction petition on December 9, 2010, finding that the petition was untimely and that defendant forfeited the issue regarding his right to testify because he should have raised the issue on direct appeal. The trial court also found that defendant's claim for ineffective assistance of counsel was without merit because he told the trial court that he understood and was exercising his right not to testify. Additionally, the trial court found that defendant's claim of actual innocence was without merit because neither affidavit constituted newly discovered evidence of actual innocence. Defendant appealed, asking us to remand for a third-stage evidentiary hearing, which we did. The third-stage evidentiary hearing began April 24, 2014, and ended on April 9, 2015.

---

[5]Peters did not state whose telephone he used to place the call or whether it was a cellular telephone or a landline.

[6]Peters did not state whether he observed Volli fire the gun.

- 10 -

XII. Antonio McDowell's Evidentiary Hearing Testimony

¶ 63 A. Direct Examination

¶ 64 At the hearing, Antonio McDowell testified that he is currently serving time at Stateville Correctional Center for first-degree murder, attempted murder, and vehicular hijacking. McDowell testified that he had been a member of the Undertaker Vice Lords at the time of the shooting in October 1995. McDowell knew Howard Carter, Allen Williams, and Devol Scott, who were also members of the Undertaker Vice Lords. McDowell also knew Patrick Davis, a member of the Gangster Disciples, and Tyrone Randolph, a member of the Mafia Vice Lords.

¶ 65 McDowell testified that, in June 1995, he observed stitches in defendant's damaged hand. McDowell also noticed that defendant could barely walk and that he had difficulty standing up straight. These injuries were due to defendant having been shot.

¶ 66 McDowell testified that, on the evening of October 22, 1995, he was standing near the intersection of Ferdinand Street and Lockwood Avenue with other members of the Undertaker Vice Lords, including Vaughan Peters, "Shawn," and "Reggie Rock." McDowell did not observe Randolph or defendant in the area at this time. McDowell witnessed a vehicle pull up in the vicinity and recognized the driver as Devol Scott. McDowell testified that he and Scott were close friends. McDowell then observed a man named Volli emerge from behind a tree wearing a bandana. Volli opened fire on the vehicle. Immediately following the shooting, McDowell ran from the scene. He returned to the scene later that evening, but did not talk to the police. McDowell identified Volli in court through a photograph marked as Defense Exhibit No. 6.

¶ 67 McDowell testified that he learned of defendant's conviction in this case sometime around 2003 or 2004, while serving time at Menard Correctional Center. Later, at a religious service in Stateville Correctional Center, he observed defendant and told him about Volli and that he knew defendant was innocent.

¶ 68 B. Cross-Examination

¶ 69 McDowell testified that he had been in prison for 17 years, belonged to the Fifth Generation faction of the Undertaker Vice Lords at the time of the shooting, and left the gang after seven years in prison. McDowell testified that he had known defendant for four years at the time of the shooting. In May 1995, defendant had the rank of chief in the Fifth Generation, and Devol Scott was chief of the Sixth Generation. Kenny Beecham was second in command under Scott with the title of prince. Allen Williams, another associate of McDowell's, was prince of the Fifth Generation. McDowell also knew Patrick Davis, a member of the Gangster Disciples.

¶ 70 McDowell testified that Mike-Mike, a member of the Sixth Generation, led by Devol Scott, attempted to murder defendant in May 1995. After this murder attempt, defendant lost the respect of the Fifth Generation for not retaliating against Mike-Mike. Subsequently, defendant was no longer considered chief of the Fifth Generation. This political rift was further exacerbated by the fact that nobody in the Fifth Generation respected their prince, Allen Williams. Eventually, the Sixth Generation took over leadership of the Fifth.

¶ 71 McDowell testified that, after the murder attempt in June 1995, he observed stitches in defendant's right hand and that defendant was walking with a hunched back. McDowell said that defendant had a limited range of motion in the fingers on his injured hand. The severity of

defendant's injuries remained unchanged each time he met defendant in July, August, September, and October of that year.

¶ 72    McDowell testified that he was with defendant on October 22, 1995. Defendant had visited McDowell at McDowell's home during the daytime. At the end of defendant's visit, McDowell drove defendant to defendant's home in Forest Park, approximately six hours prior to the shooting. That evening, McDowell was hanging out by Ferdinand Street and Lockwood Avenue with other members of the Fifth Generation, including Vaughan, Shawn, and Volli—who had been present at the intersection for at least an hour prior to the shooting. McDowell observed Devol Scott pull up in a vehicle. Volli then came out from behind a tree, put a bandana up around his face, and began shooting at the vehicle that Devol Scott was driving. McDowell observed Volli firing a 9-millimeter handgun in his right hand. McDowell heard multiple shots as he took off running to his home. Thirty minutes later, McDowell returned to the scene of the shooting and learned that Davis and Scott had been murdered.

¶ 73    McDowell testified that he was aware that defendant had been arrested and charged with the murder of Scott and Davis shortly after October 22, 1995. McDowell learned of defendant's conviction sometime in 2003 or 2004 while serving time at Menard Correctional Center. McDowell kept the information he had about Volli to himself until he noticed defendant in a prayer meeting at Stateville Correctional Center in 2008, which was the first time he had noticed defendant since the shooting in October 1995.

¶ 74    At one of these prayer meetings, McDowell told defendant that he knew who was responsible for the murders of Scott and Davis. After a few months of consideration, McDowell told defendant he would help him because the threat of harm befalling McDowell or his family no longer existed because Mike-Mike was dead.

¶ 75                            C. Redirect Examination

¶ 76    McDowell clarified that he and defendant did not live in the same tier at Stateville Correctional Center when they met in 2008. On the day of the murder, he did not talk to the police because he was afraid of Volli, who had a reputation for shooting people, and McDowell feared for his family's safety and his own.

¶ 77                            D. Recross-Examination

¶ 78    McDowell testified that he and defendant observed each other only every two weeks in prison because they resided in different buildings. The only time they would run into each other was at prayer meetings. McDowell noticed defendant one or two times at the prayer meetings before telling him that he knew the true identity of Scott and Davis's killer. McDowell feared going to the police with this information because Volli was a threat to him and Mike-Mike and other members of the Sixth Generation were a threat to him and his family.

¶ 79    McDowell then stated that he did not discover that Volli had been killed until he spoke with investigators. When asked why he was comfortable helping defendant if he was unaware that Volli was dead, McDowell claimed that the threat of Volli injuring his family no longer existed in 2008 because he had learned through talk from the streets that Volli had changed and was no longer frequenting McDowell's neighborhood. McDowell then stated that the threat he felt from Volli was personal and that Volli did not know his family. McDowell did not come forward with information about Volli because he felt threatened by other members of the Sixth

Generation, except for Mike-Mike who was deceased.

¶ 80                  XIII. Vaughan Peters's Evidentiary Hearing Testimony
¶ 81                              A. Direct Examination
¶ 82     At the hearing, Vaughan Peters testified that he is currently employed as an assistant at Megabus. Peters was a member of the Undertaker Vice Lords at the time of the murder and knew defendant. After defendant was shot, Peters observed that defendant could not stand up straight or move quickly, and that defendant's hands were swollen.

¶ 83     Peters testified that, on October 22, 1995, he went to Ferdinand Street and Laramie Avenue because Weasel, a fellow gang member and defendant's brother, had been killed earlier in the day. Peters was hanging out and drinking with other gang members, including Young T, Volli, and Freddy Pie. Tyrone Randolph, a member of the Mafia Insanes, was not present that day since the Undertaker Vice Lords and Mafia Insanes were at war. Peters did not observe defendant there so he called defendant at defendant's girlfriend's home in Forest Park.

¶ 84     Peters testified that he was walking toward the corner of Ferdinand Street and Laramie Avenue when he first heard gunshots. After the first shot, Peters observed Volli walking toward the street with a gun, and then Peters ran to his grandmother's house. Peters estimates that he heard more than 10 shots as he ran away.

¶ 85     Peters testified that he learned of the murders the next day when he returned to the block and some people informed him who had been killed. Peters then left town for three to four days. Peters never went to the police with the information he had about Volli.

¶ 86                              B. Cross-Examination
¶ 87     On cross, Peters testified that he belonged to the Fifth Generation faction of the Undertaker Vice Lords at the time of the murder, but he left the gang in 2004. Defendant had the rank of king in the Fifth Generation. Defendant did not conduct any meetings as king or exercise any leadership roles. Peters was unsure as to whether there was a leader of the Sixth Generation. The Fifth Generation and the Sixth Generation factions were at war. Eddie Richardson, nicknamed "Hineef," was the leader of all the Undertaker Vice Lords factions.

¶ 88     Peters testified that the last time he observed defendant was a few weeks after defendant was shot. Due to his gunshot wounds, defendant appeared to walk like an old man and could barely stand up. On the night of the shooting, Peters still considered defendant to be the king of the Fifth Generation.

¶ 89     Peters testified that, on the night of the murder, he arrived on Ferdinand Street around 5 p.m. or 6 p.m. He remembers seeing Volli, Young T, and Freddy Pie there—all members of the Fifth Generation. Volli and Peters were good friends, and everyone present was discussing the murder of Weasel, defendant's younger brother. Peters and 13 or 14 of his fellow gang members decided to call defendant to express their condolences for Weasel's death. Peters did not recall whether they used a house phone or a pay phone to speak with defendant. Defendant's girlfriend, Lyda, answered the phone and then handed it to defendant. Peters spoke with defendant, but did not remember who dialed or whether Volli spoke with defendant.

¶ 90     Peters testified that he heard the first gunshot when he was walking to a restaurant on the corner. Peters observed Volli with a gun walking towards the street, but Peters did not witness

Volli pull the trigger. Peters then ran to his grandmother's house, and he did not discover until the next day that Devol Scott had been shot. Three to four days later, Peters learned that defendant was arrested for the murders. At the time that Peters learned that defendant was going to trial, Peters was incarcerated. Peters learned of Volli's death sometime between 1996 and 2005 during Peters's incarceration at Stateville Correctional Center. Peters was unaware why the public defender's office showed up at Stateville Correctional Center, asking him questions about the shooting. Peters had not reached out to anyone regarding defendant and the shooting. The last time Peters observed Volli was the night of the shooting.

¶ 91                                    C. Redirect Examination

¶ 92         Peters testified that he knew a man named "Tone" in the Undertaker Vice Lords, but Peters referred to him as "Tidy Bowl."[7] Tone was one of the people hanging out on Ferdinand Street on the night of the shooting. Peters also knew a man with the nickname "Rayskee."[8] Rayskee was not on Ferdinand Street on the night of the shooting. Peters did not observe Young T or Freddy Pie with a weapon, and he never observed defendant during Peters's own incarceration at Stateville Correctional Center.

¶ 93                                    D. Recross-Examination

¶ 94         Peters testified that McDowell and Williams did not have any rank in the Undertaker Vice Lords. Peters last observed McDowell a month or two after the shooting.

¶ 95                        XIV. Mary Clements's Evidentiary Hearing Testimony
¶ 96                                    A. Direct Examination

¶ 97         Mary Clements testified that she is currently employed as a supervisor of investigations with the Cook County public defender's office. Clements became involved in defendant's case when an investigation request came into the public defender's office in December 2009. Initially, Clements was tasked with notarizing defendant's affidavit and interviewing Antonio McDowell. Clements interviewed McDowell at Stateville Correctional Center three times between 2009 and 2010. During an interview with McDowell, Clements learned about Vaughan Peters and Volli.

¶ 98         Clements discovered that Peters was at Stateville Correctional Center by running his name through the IDOC website. Clements learned from Peters that Volli was deceased. Peters found a letter from Volli that indicated that Volli's real first name was Savalas. Clements took that information and used Accurate and Westlaw CLEAR to find every Savalas in Chicago. Clements found a Savalas Brewer who was from the south side of Chicago and deceased. Clements then obtained a photograph of Brewer from the jail's computer system, IMACS, which was identified as Defense Exhibit No. 6. Clements contacted the emergency contact person listed on Brewer's CLEAR report and spoke to Brewer's mother, who confirmed Brewer's death. Clements took the photograph of Brewer and showed it to defendant,

---

[7] "Tone" and "Tidy Bowl" are nicknames of Antonio McDowell, one of defendant's newly discovered witnesses.

[8] "Rayskee" is the nickname of Allen Williams, the attempted murder victim.

McDowell, and Peters between 2009 and 2010.[9]

¶ 99                                B. Cross-Examination

¶ 100    Clements testified that she had three meetings with McDowell at Stateville Correctional Center and presented an affidavit to McDowell on her third visit. Clements met with Peters three times as well, twice at Stateville Correctional Center and once at East Moline Correctional Center. Clements did not inquire about the current gang membership of Peters or McDowell. Clements testified that she found out that Volli was Savalas Brewer and that Brewer's mother stated that Brewer died in December 2003 on Lake Street.

¶ 101    Clements testified that McDowell was uncertain of whether Volli was dead, but that Peters knew that Volli was deceased. Peters gave Clements the information that Volli had been killed on Lake Street and that he had a brother named Romey, a fact which Clements corroborated during her conversation with Brewer's mother. Clements testified that Peters showed her an envelope, addressed to Peters, that had Savalas in the return information. Clements believed it was an old letter because it was not addressed to Stateville Correctional Center, the prison that Peters was in at the time of his interview with Clements.

¶ 102                   XV. Defendant's Evidentiary Hearing Testimony
¶ 103                                A. Direct Testimony

¶ 104    Defendant testified that he had prior convictions in 1991 and 1992 for a weapons offense and a robbery offense. Defendant was shot approximately 11 times on May 11, 1995, and treated at Mt. Sinai Hospital, where he had surgery on his stomach, hand, and left lung. Defendant was informed by a doctor that the bullet that hit his hand exploded upon impact, causing severe damage. The doctors attached a metal apparatus to defendant's hand, which was removed near the end of July or the beginning of August 1995. After the shooting, defendant could no longer walk properly, use his right hand, or raise his left arm. In September 1995, defendant could not hold a glass or make a fist with his right hand or walk very far or long.

¶ 105    On the evening of October 22, 1995, defendant's grandmother called him and told him that his brother had been shot and killed. Defendant testified that he was at home when he received the call and that he did not leave his home after speaking to his grandmother. Defendant testified that Devol Scott, one of the murder victims, was like a little brother to him and that defendant did not blame Scott for shooting defendant because Scott was in North Dakota at that time. Defendant did not know Patrick Davis, who was the other murder victim. Defendant had a close relationship with Allen Williams, the attempted murder victim, because Williams's father helped raise defendant and taught both Williams and defendant about how the streets work. Defendant denied shooting Scott, Williams, and Davis.

¶ 106                                B. Cross-Examination

¶ 107    On cross, defendant testified that he was shot 11 times on the evening of May 11, 1995, in front of the corner store on Gladys and Cicero Avenues. Defendant was a member of the

_____

    [9]Clements's testimony does not state whether defendant, McDowell, and Peters identified the man in the photograph as Volli, to her, at that time.

Undertaker Vice Lords when he was shot and had the rank of "King" of the Fifth Generation. Defendant was made king of the Fifth Generation when he was 15 years old, seven years prior to being shot. Defendant was responsible for keeping order within the Fifth Generation and mediating any conflicts that arose. Allen Williams, the attempted murder victim, was defendant's second in command and had full authority to settle disputes in defendant's absence. While defendant was in the hospital recovering from his gunshot wounds, Williams was in command of the Fifth Generation.

¶ 108     Defendant testified that Devante Branch was the chief of the Sixth Generation Undertaker Vice Lords and that Kenny Beecham was the prince of the Sixth Generation. Defendant reported to Eddie Richardson, nicknamed "Hineef," who was the king of all generations of the Undertaker Vice Lords. Defendant claims that Branch's and Beecham's roles were never officially commissioned by anyone else in the gang. The Sixth Generation was also in turmoil as they did not like their chief, Devante Branch, and instead chose to respect Devol Scott—a Sixth Generation member who did not have any rank. The Fifth and Sixth Generations had non-violent arguments from time to time in 1995.

¶ 109     Defendant did not know who shot him on May 11, 1995. Defendant believed at least two shooters were involved because he was shot on the right side of his body and the left side of his neck. The police told defendant that he was shot with two different guns, but they were able to identify only one of them as a 9 millimeter. A woman named Sinbad, who lived on the corner where defendant was shot, informed defendant that a man with the nickname "Mike-Mike" shot him. Sinbad also told defendant that Chucky may have been involved, but she was not sure. Defendant tried to persuade Sinbad to talk to the police or the State's Attorney's office but Sinbad did not want to be involved. Defendant had met Mike-Mike at Branch's house in 1994. Mike-Mike belonged to the Traveler Vice Lords in 1994, but switched his affiliation to the Sixth Generation Undertaker Vice Lords shortly thereafter. Chucky was also an acquaintance of defendant and a member of the Fifth Generation, who spent most of his time hanging around with the Sixth Generation.

¶ 110     Defendant testified that he was shot because Mike-Mike, Branch, and Chucky were trying to establish more power and authority over their territory on Cicero Avenue. All members of the Undertaker Vice Lords were allowed to deal drugs on Cicero Avenue and keep all the proceeds for themselves. Defendant believed that the shooting was less about a war between the two factions and more about absolving regular gang members of any responsibility to those in positions of power within the gang. After defendant was released from the hospital, he was no longer considered the king of the Fifth Generation, primarily due to the fact that other gang members viewed him as weak. Defendant discovered who shot him sometime in July 1995.

¶ 111     Defendant testified that he went to rehabilitation at Mt. Sinai Hospital for about two months. Defendant stopped going because people he relied upon to drive him stopped showing up and defendant refused to take the bus anywhere.

¶ 112     Defendant testified that he never knew who shot his brother, but that Branch was charged with the shooting and eventually incarcerated for it. Defendant did not own a vehicle so his friends would drive him around. An Undertaker named Ja-Rule was defendant's primary driver, and defendant trusted him because Ja-Rule was not from Cicero Avenue. Defendant did not have any security detail, but did carry a .38-special revolver with him for protection from rival gangs like the Mafia Insane Vice Lords, who had been at war with the Undertaker Vice Lords since 1992.

¶ 113 Defendant's brother, nicknamed Weasel, had finished serving a house arrest sentence a day or two before he was shot and killed. Weasel would demand that members of the Sixth Generation give him a portion of the profits generated from their drug sales on Cicero Avenue. Due to Weasel's relationship with defendant, Sixth Generation members would comply with Weasel's demands.

¶ 114 Defendant testified that he quit the Undertaker Vice Lords 13 or 14 years ago while at Stateville Correctional Center.

¶ 115 C. Redirect Examination

¶ 116 On redirect, defendant testified that, after his release from the hospital, he resided in Forest Park with his girlfriend, Lyda Belk. Defendant was not shot in his left hand, although most of his injuries occurred on the left side of his body. Defendant had injuries on the left side of his chest and underwent surgery on his left lung. Defendant was also shot beneath his armpit, and Belk would help him wash because defendant could not raise his arm up. Defendant testified that members of the Fifth Generation were not required to give defendant a portion of their drug sales.

¶ 117 D. Recross-Examination

¶ 118 Defendant testified that in October 1995 he was able to make a fist with his left hand. He no longer had the pins in his right hand, and he washed himself without assistance. Defendant lived at his girlfriend's mother's house in Forest Park until his arrest on October 25, 1995. Defendant's friend Tweet drove him to Forest Park after he was released from his hospital stay.

¶ 119 XVI. Trial Court's Ruling

¶ 120 On April 9, 2015, the trial court concluded that the new evidence presented by defendant lacks credibility and, when scrutinized in the context of the entire trial record, it was not so persuasive that it would probably change the result on retrial. The trial court found that it defied logic to think that McDowell and Peters were completely oblivious to the fact that defendant had been convicted of first degree murder. Based on their status as fellow gang members and eyewitnesses, McDowell and Peters both had an interest in learning who had been implicated, and their testimony that they never sought out this information was highly incredible. The trial court also observed that McDowell personally knew Allen Williams, who testified as a State's witness against defendant. The trial court also found that defendant's testimony lacked overall credibility, noting that defendant's alibi directly conflicted with Peters's testimony. Peters testified that defendant was at his girlfriend's home when the shooting occurred, while defendant testified that he was at his own home at the time. For these reasons, the trial court found that defendant failed to establish the denial of a constitutional right by a preponderance of the evidence. Thus, the trial court granted the State's motion for a directed finding and dismissed the postconviction petition.

¶ 121 ANALYSIS

¶ 122 On appeal, defendant claims that the trial court erred in dismissing his postconviction petition after a third-stage evidentiary hearing. Defendant claims that McDowell's and Peters's testimony—implicating another man in the shooting of Devol Scott, Patrick Davis, and Allen

Williams—is noncumulative, conclusive evidence that would likely change the result on retrial. For the following reasons, we affirm.

¶ 123                              I. Stages of Postconviction Proceeding

¶ 124        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 (West 2014)) provides that a defendant may challenge his or her conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006) (citing *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005)). To be entitled to postconviction relief, a defendant bears the burden of establishing that a substantial deprivation of his constitutional rights occurred at his original trial. *People v. Waldrop*, 353 Ill. App. 3d 244, 249 (2004); 725 ILCS 5/122-1(a) (West 2014).

¶ 125        In noncapital cases, the Act provides for three stages. *Pendleton*, 223 Ill. 2d at 471-72. At the first stage, the trial court has 90 days to review a petition and may summarily dismiss it, if the trial court finds that the petition is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2014); *Pendleton*, 223 Ill. 2d at 472. If the trial court does not dismiss the petition within that 90-day period, the trial court must docket it for further consideration. 725 ILCS 5/122-2.1(b) (West 2014); *Pendleton*, 223 Ill. 2d at 472.

¶ 126        If the petition survives initial review, the process moves to the second stage, where the trial court appoints counsel for the defendant when a defendant cannot afford counsel. 725 ILCS 5/122-4 (West 2014). Appointed counsel may make any amendments that are "necessary" to the petition previously filed by the *pro se* defendant. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). After defense counsel has amended the petition, the State may file a motion to dismiss or an answer. 725 ILCS 5/122-5 (West 2014); *Pendleton*, 223 Ill. 2d at 472. If the State moves to dismiss, the trial court may hold a dismissal hearing, which is still part of the second-stage. *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998).

¶ 127        To advance to the third stage, a petitioner must make a "substantial showing," which can be accomplished by relying on the record in the case or by supplying supporting affidavits. *Coleman*, 183 Ill. 2d at 381. The trial court is foreclosed from engaging in any fact-finding because all well-pleaded facts must be taken as true at the second stage of the proceedings. *People v. Wheeler*, 392 Ill. App. 3d 303, 308 (2009) (citing *Coleman*, 183 Ill. 2d at 380-81). "[W]hen a petitioner's claims are based upon matters outside the record, the [Act] does not intend such claims be adjudicated on the pleadings." *People v. Snow*, 2012 IL App (4th) 110415, ¶ 15.

¶ 128        If the trial court denies the State's motion to dismiss, or if the State chooses not to file a dismissal motion, then the State "shall" answer the petition. 725 ILCS 5/122-5 (West 2014); *Pendleton*, 223 Ill. 2d at 472. Unless the trial court allows further pleadings (725 ILCS 5/122-5 (West 2014)), the proceeding then advances to the third stage, which is an evidentiary hearing. 725 ILCS 5/122-6 (West 2014); *Pendleton*, 223 Ill. 2d at 472-73. In the case at bar, the trial court originally dismissed defendant's petition at the second stage, but the appellate court reversed and remanded for a third-stage evidentiary hearing.

¶ 129        An evidentiary hearing is held only where the allegations of the postconviction petition make a substantial showing that a defendant's constitutional rights have been violated and those allegations are supported by affidavits, records, or other evidence. *Waldrop*, 353 Ill. App. 3d at 249. The affidavits that accompany a postconviction petition must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting

a defendant's allegations. *Waldrop*, 353 Ill. App. 3d at 249. At the evidentiary hearing, the trial court "may receive proof by affidavits, depositions, oral testimony, or other evidence," and "may order the [defendant] brought before the court." 725 ILCS 5/122-6 (West 2014).

¶ 130    In the case at bar, the trial court dismissed defendant's postconviction petition after a third-stage evidentiary hearing where new evidence was introduced through the testimony of two witnesses. Defendant appeals and asks us to remand for a new trial, or, in the alternative, to reverse the trial court's order allowing the State's motion for a directed finding and remand the case for a continuation of the third-stage hearing.

¶ 131                                II. Standard of Review

¶ 132    At a third-stage evidentiary hearing, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. English*, 406 Ill. App. 3d 943, 951 (2010).[10] When a petition is advanced to a third-stage evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a trial court's decision unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. If no fact-finding or credibility determinations were necessary at the third-stage, and the issues presented were all pure questions of law, we apply a *de novo* standard of review, unless the judge who presided over the postconviction proceedings had some special expertise or familiarity with defendant's trial or sentencing and that familiarity had some bearing on the disposition of the postconviction petition. *English*, 2013 IL 112890, ¶ 24; *People v. Beaman*, 229 Ill. 2d 56, 72 (2008). In the case at bar, since new evidence was presented at the evidentiary hearing and the trial court was required to make credibility determinations, our standard of review is the manifest error standard. *English*, 2013 IL 112890, ¶¶ 23-24; *English*, 406 Ill. App. 3d at 952. " 'Manifestly erroneous means arbitrary, unreasonable and not based on the evidence.' " *People v. Ceja*, 204 Ill. 2d 332, 347 (2003) (quoting *People v. Wells*, 182 Ill. 2d 471, 481 (1998)).

¶ 133                                III. Actual Innocence

¶ 134    The wrongful conviction of an innocent person violates due process under both the United States Constitution (U.S. Const., amend. XIV, § 1) and the Illinois Constitution (Ill. Const. 1970, art. I, § 2), and thus, a defendant can raise in a postconviction proceeding a freestanding claim of actual innocence based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009); *People v. Washington*, 171 Ill. 2d 475, 489 (1996). To assert a claim of actual innocence based on newly discovered evidence, a defendant must show that the evidence is (1) newly discovered, (2) material and not merely cumulative, and (3) capable of changing the result on retrial. *Ortiz*, 235 Ill. 2d at 333-34. In his postconviction petition, defendant claims that he is actually innocent based on the testimony of the two witnesses who testified that he was not the shooter. The trial court divided its analysis into two parts: "first, the Court consider[ed] the new evidence presented by petitioner and conclude[d] that this evidence lacks credibility; and second, the Court scrutinize[d] the new evidence in the context of the entire trial record and determine[d] that the new evidence is not so persuasive that it would probably change the result of retrial." We analyze the trial court's finding using the framework of the

---

[10]Although the appellate court case of *English* in this sentence and the supreme court case of *English* cited in the next sentence share the same name, the two cases are different cases concerning different defendants.

three-prong test articulated in *Ortiz*.

¶ 135                              A. Newly Discovered Evidence

¶ 136        As noted, the trial court did not explicitly address whether McDowell's and Peters's testimony constituted newly discovered evidence. The trial court did find that "[t]heir purported lack of knowledge defies common sense and human experience, which places an imprimatur of unreliability upon the testimony of McDowell and Peters."

¶ 137        Our supreme court has defined newly discovered evidence as "evidence [(1)] that has been discovered since the trial and [(2)] that the defendant could not have discovered sooner through due diligence." *Ortiz*, 235 Ill. 2d at 334. Defendant argues that the testimony of these two witnesses is newly discovered because McDowell and Peters claim that they did not learn of defendant's conviction until 2003 or 2004, and defendant could not have known who witnessed the shooting because he was not there. The State argues that McDowell's and Peters's purported lack of knowledge about defendant's conviction defies common sense and human experience.

¶ 138        We understand the trial court's determination to be that, *had* the testimony been credible, it would have been considered newly discovered. We discuss the credibility of McDowell and Peters under the third prong, which addresses whether their testimony would change the result at trial.

¶ 139                             B. Material and Noncumulative

¶ 140        Regarding the second prong, the trial court found that the testimony of McDowell and Peters is material and noncumulative. Our supreme court has held that "[e]vidence is considered cumulative when it adds nothing to what was already before the jury." *Ortiz*, 235 Ill. 2d at 335. See also *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). Testimony is not cumulative when it would create new questions in the mind of the trier of fact. *People v. Ortiz*, 385 Ill. App. 3d 1, 11 (2008); *People v. Williams*, 392 Ill. App. 3d 359, 369 (2009). Both witnesses testified regarding the ultimate issue of whether defendant was the shooter, and there was no other testimony at trial excluding defendant as the shooter. However, as discussed below in the analysis of whether the new evidence is capable of changing the result on retrial, their testimony, while material and noncumulative, is not sufficient to undermine confidence in the outcome of the original proceeding.

¶ 141                         C. Incapable of Changing the Result on Retrial

¶ 142        As to the third prong, the Illinois Supreme Court has found that newly discovered evidence is capable of changing the result on retrial when "the evidence of defendant's innocence would be stronger when weighed against the recanted statements of the State's eyewitnesses." *Ortiz*, 235 Ill. 2d at 337. On retrial, "[t]he fact finder will be charged with determining the credibility of the witnesses in light of the newly discovered evidence and with balancing the conflicting eyewitness accounts." *Ortiz*, 235 Ill. 2d at 337. Our supreme court noted that " 'this does not mean that [defendant] is innocent, merely that all of the facts and surrounding circumstances, including the testimony of [defendant's witnesses], should be scrutinized more closely [at a retrial] to determine the guilt or innocence of [defendant].' " *Ortiz*, 235 Ill. 2d at 337 (quoting *Molstad*, 101 Ill. 2d at 136 (finding that the defendant's newly discovered evidence of five

- 20 -

codefendants, who would testify that he was not present at the crime scene, would probably change the result on retrial when balanced against the testimony of a single eyewitness implicating the defendant)). Under a manifest-error standard, we find that the trial court's ruling, which was based almost exclusively on a credibility determination, was not arbitrary or unreasonable. *Ceja*, 204 Ill. 2d at 347.

¶ 143    As the trial court observed, both McDowell and Peters observed the shooting, yet did not come forward with information until many years after defendant's conviction. McDowell claims this is because he did not learn of defendant's conviction until he met him in prison in 2003 or 2004. Peters claims he was aware that defendant had been arrested, but was sure that defendant would not have been convicted because every person present at the shooting knew that defendant was not involved. McDowell and Peters were both friends of defendant; they all belonged to the same gang and had hung out together prior to the night of the shooting. Therefore, the trial court reasoned, McDowell and Peters had a significant interest in learning who had been implicated in the shooting, and their testimony that they never knew of defendant's conviction until years later was incredible. Furthermore, McDowell and Peters both personally knew Allen Williams, the attempted murder victim, who was a member of their gang and a State's witness against defendant. The trial court found it incredible that neither McDowell nor Peters would have an interest in a case where a member of their own gang took the stand against their former leader.

¶ 144    Defendant likens the account of the shooting provided by McDowell and Peters at the evidentiary hearing to the testimony provided by Hernandez in *People v. Ortiz*. In *Ortiz*, Hernandez, an eyewitness with new evidence of the defendant's actual innocence, came forward on his own volition after meeting the defendant's mother in Chicago and telling her that he knew defendant was not guilty. *Ortiz*, 235 Ill. 2d at 327. Hernandez had left the state shortly after the occurrence. *Ortiz*, 235 Ill. 2d at 327. However, McDowell's and Peters's explanations for coming forward differ dramatically from Hernandez's explanation. On cross-examination, McDowell testified that an investigator from the public defender's office met with him and brought the affidavit that he signed. Then, on redirect, McDowell testified that he did not come forward after the shooting because he was afraid of Volli, the alleged actual killer. On re-cross, McDowell testified that Volli actually was not a threat because Volli did not know his family and was not from the same neighborhood. Peters admitted that he knew defendant had been arrested for the shooting, yet he did not go to the police.

¶ 145    Defendant argues that the trial court incorrectly stated that McDowell and Peters "never asked around or figured out who had been charged with the murders." Indeed, McDowell and Peters both testified that they were aware of defendant's arrest shortly after the shooting; however, this discrepancy does not have a significant impact on the trial court's credibility determination. Peters's knowledge of defendant's arrest strengthens the distinction between the witness in *Ortiz*, who came forward on his own volition, and Peters, who did not make any attempt to clear defendant's name until he was approached by the public defender's office. Peters had no idea why the public defender's office reached out to him because he had not reached out to anyone regarding the shooting. McDowell waited 13 years, and only came forward with his information when he observed defendant at a prayer meeting in prison. The trial court found this testimony to be lacking in credibility.

¶ 146    Defendant also argues that the distinction drawn in the trial court's order between defendant's testimony that he was at home and Peters's testimony that defendant was at his

girlfriend's house is one without difference, since he lived at his girlfriend's home. However, it does not change the credibility determination of the trial court because it found that defendant's testimony "at the evidentiary hearing was cumulative of other evidence presented at trial, and therefore [was] not supportive of his actual innocence claim." Thus, the distinction was not a factor in the trial court's credibility determination of McDowell and Peters.

¶ 147 We remanded for the specific purpose of making a credibility determination, and the trial court did just that, finding neither McDowell nor Peters to be credible. For the foregoing reasons, we cannot find that the trial court's ruling was manifestly erroneous.

¶ 148 CONCLUSION

¶ 149 For the aforementioned reasons, we find that the trial court's ruling was not manifestly erroneous, and thus we affirm the trial court's third-stage dismissal of defendant's postconviction petition.

¶ 150 Affirmed.