**FIRST JUDICIAL DISTRICT**
**SIXTH DIVISION**
**Date:   December 17, 2010**

No. 1-09-1449

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 96 CR 11508 |
| | ) | |
| ANTHONY ENGLISH, | ) | Honorable |
| | ) | James B. Linn, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion.

Presiding Justice Garcia and Justice Cahill concurred in the judgment and opinion.

## OPINION

In this appeal, defendant Anthony English contests the dismissal of his postconviction petition after a third-stage evidentiary hearing.  For the reasons stated below, we affirm.

## BACKGROUND

### 1. Overview

Defendant Anthony English was charged with the gang-related shooting and

1

murder of Keith Lewis on November 25, 1995. During the jury trial held in October 1997, defendant requested a continuance after the close of the State's evidence, because a defense witness, William Brown, was not in the courtroom. After the State objected on the ground that the witness had not been subpoenaed for that day, the trial court denied the request. The jury then found defendant guilty of the first degree murder of Keith Lewis. Several months earlier, defendant had also been found guilty of the shooting death of another victim, Bertram Scarver. On November 17, 1997, defendant was sentenced by then circuit court judge Themis Karnezis[1] to natural life in prison.

The Lewis case has been before the appellate court on two prior occasions. First, on direct appeal, defendant claimed that the State failed to prove him guilty beyond a reasonable doubt of the Lewis murder and that the trial court abused its discretion in refusing to grant a continuance in order to locate and produce a witness, namely, William Brown. *People v. English*, No. 1-97-4521, order at 1 (1999) (unpublished order under Supreme Court Rule 23) (*English I*). The appellate court affirmed defendant's conviction for the Lewis murder, noting that two eyewitnesses testified that they observed defendant shoot the victim, in broad

---

[1]Justice Karnezis is now a justice of the Illinois Appellate Court.

daylight and at close range, and that the proposed eyewitness claimed that he did not see who fired the gun. *English I*, No. 1-97-4521, order at 5-6.

Defendant's second appeal to this court occurred after a trial court dismissed his postconviction petition. Defendant successfully appealed the trial court's second-stage dismissal, and we reversed and remanded for a third-stage evidentiary hearing. In his *pro se* postconviction petition filed February 22, 2001, defendant had claimed actual innocence, alleging that the State's eyewitnesses had reason to testify falsely and that Brown, his proposed witness, would be more credible because Brown had no reason to testify for the defense. In his supplemental petition filed in March 2005, defendant alleged that his trial counsel was ineffective for failing to call Brown to testify at trial. After reviewing Brown's affidavit, we held that "[t]he information in Brown's affidavit, if taken as true, is potentially exculpatory and calls into question the credibility of the State's witnesses." *People v. English*, No. 1-05-2287, order at 7 (2007) (unpublished order under Supreme Court Rule 23) (*English II*).

After our remand, the trial court held a third-stage evidentiary hearing where the missing Brown finally testified, as well as Joshua Cole, who had previously testified as a State witness at defendant's trial. At the end of the hearing, the trial

court found both men "wholly lacking in credibility." The trial court found that "[t]he performances they put on here in [this] courtroom [were] sad and not at all compelling." In addition, the trial court observed that, since the time of defendant's trial, both Brown and Cole had "picked up quite a bit of additional baggage in [that] they're both now convicted murderers themselves." Defendant's petition was again denied by the trial court, and he now appeals to this court a third time.

For the reasons stated below, we affirm the trial court's dismissal of defendant's postconviction petition.

## 2. Evidence at Trial

The evidence at trial established that, during the afternoon of November 25, 1995, decedent Keith Lewis was shot several times in a gang-related incident near Kostner Avenue and Van Buren Street in Chicago. Lewis died two days later.

Keith Dickerson testified that he was walking with his father J.C. Orsby, as well as William Brown, Keith Lewis and two others, when defendant drove by. Defendant shouted to Dickerson's group, and then approached on foot. Defendant punched Lewis and, when Lewis tried to walk away, defendant shot Lewis in the back. Lewis fell to the ground, and defendant shot Lewis again as Lewis lay on the ground.

Dickerson testified that defendant's nickname was "Shorty" and that Dickerson knew defendant in the years before they joined rival gangs. Dickerson, Lewis and Brown were all in the Gangster Disciples gang, while defendant was in the New Breed gang.

Dickerson testified that he did not contact the police because he was afraid for his family, and he believed that his gang would avenge the shooting. He admitted that his family moved from the area the following month. Dickerson did not tell the police about the murder until his own arrest for an unrelated robbery charge in March 1996. However, Dickerson denied that he was promised anything in exchange for this information. Dickerson related the circumstances of the murder to Detective Daniel McWeeny, who also testified at trial.

Dickerson's father, J.C. Orsby, also testified at trial and corroborated his son's description of events. Orsby, a convicted drug dealer, stated that he decided to talk to police when he was contacted about his son's arrest for armed robbery. Orsby had selected defendant's photograph from a photographic array at the police station, but he denied that any promises were made regarding his son's armed robbery case.

Detective McWeeny testified that the same gun was involved in the shooting

5

of Lewis, as well as the shooting of Bertram Scarver a month later. As a result, Detective McWeeny was conducting both investigations. After Dickerson was arrested for armed robbery, he provided information about the Lewis murder and identified defendant's photograph from a photographic array. Detective McWeeny denied making any promises to Dickerson in exchange for Dickerson's information regarding the Lewis murder. During the investigation, the detective also spoke to Joshua Cole who provided defendant's location, and who identified defendant in a lineup after defendant's arrest.

Joshua Cole testified that he belonged to the same gang, the New Breed, as defendant. Cole saw defendant on the day of the shooting, but before Lewis was shot. Defendant asked Cole to "close these n * * * s down" but Cole refused. Soon afterward, Cole heard four shots and drove to the area where Lewis was shot, to see if defendant was all right. Cole saw defendant jogging out of a nearby alley, and defendant asked Cole for a ride, saying he was "dirty," which meant that he was carrying a gun. Cole did not give defendant a ride.

Cole also testified that, on December 27, 1995, he refused a request by defendant to bring Bertram Scarver out from a store and then, shortly thereafter, Cole observed defendant shoot Scarver. Cole failed to contact the police, and he

6

agreed to testify only after his family's moving expenses and first month's rent were paid, but he denied that this was a bribe to testify falsely. Cole admitted that he lied under oath before the grand jury about how long he had known defendant. Cole also had two 1995 juvenile adjudications for weapons violations, but he denied shooting the victim.

Dwight Sanders testified for the State as a hostile witness that he was present at Scarver's shooting, but that he did not see the shooter. He did not know defendant or anyone named "Shorty." Sanders denied having told a grand jury that Shorty was in front of the store immediately before the Scarver shooting. He also denied having told the grand jury that Shorty walked up behind Scarver, tapped Scarver on the shoulder and shot Scarver when he turned around.

A firearms examiner testified that bullets removed from both Lewis and Scarver came from the same gun.

After the State rested, defense counsel requested a continuance because a defense witness, William Brown, was not in court. The defense then made an offer of proof that Brown would testify that he saw a fight involving Joshua Cole and victim Keith Lewis, that he heard gunshots, and that he saw Cole run away carrying a gun. The State responded that Brown had indicated earlier that he did not want to

get involved in the case and that he had lied to police. The State also noted that it had no record of Brown being subpoenaed for that day. The trial court then denied the continuance.

Based on the evidence it heard, the jury found defendant guilty of first degree murder.

### 3. Evidence at Third-Stage Evidentiary Hearing

On February 25, 2009, over 10 years after defendant's jury trial, missing witness William Brown finally testified. As noted above, the trial court held a third-stage evidentiary hearing after this court remand for that purpose. The hearing occurred over the course of two days: on February 25, 2009, for the testimony of William Brown; and on May 19, 2009, for the testimony of an additional defense witness, Joshua Cole. Unlike Brown, Cole had previously testified at defendant's original trial, back in October of 1997.

### a. Brown's Testimony

William Brown testified that he was currently incarcerated for first degree murder. Brown testified: (1) he signed an affidavit in 2005 on defendant's behalf; (2) then he sent defense counsel a letter stating that he wanted no involvement with defendant's case; and (3) he later spoke to an investigator from the State's

Attorney's Office in October 2008. He denied contradicting the earlier affidavit during the interview with the investigator.

Brown testified that he was present during the shooting, which occurred during the afternoon of November 25, 1995, but that he did not see the shooter. Brown was approximately 20 feet from the victim when the victim was shot.

Brown testified that "a small gang fight" was taking place. He could not recall how many people were involved in the fight but it was more than five. During the fight, he (Brown) was fighting with defendant, and he did not see defendant with a weapon at any point. Specifically, Brown had his back against a vehicle, and he was wrestling with defendant. At some point, while he was still wrestling with defendant, Brown heard a weapon fire. One of the other boys, who was behind Brown and defendant, fired the gun, and "[t]hat stopped everything once the shot was fired." Brown did not know the name of the individual who fired the shot, but he assumed that the shooter was a member of the New Breed gang. Brown explained that the New Breed gang was fighting Brown's gang, which was the Gangster Disciples. Brown thus assumed that the shooter was with the New Breed gang, since the victim was with Brown. After the shot, Brown and the other fight participants all ran.

9

Brown testified that, after the incident, he did not speak with the police. Brown also stated that he was never subpoenaed, and he was never contacted by either defendant's trial counsel or someone from his office. However, Brown was aware that defendant's case was going to trial in October 1997, and his parole officer told him that he had to come to court, so he came. After he arrived at court, a female State's Attorney told him, "we need you to testify, say he did this, he already got natural life on another case, you don't have to worry about it." When Brown insisted that "he ain't the one that done the shooting because we was fighting," the State's Attorney told him that he could go. The individuals present were Brown; two State's Attorneys, a woman and a man; Brown's cousin, Gerald Bryant; and an Illinois corrections officer. Brown testified that Bryant's father was J.C. Orsby and that Bryant subsequently testified at defendant's trial

Brown testified that, some years later, he signed an affidavit, after an investigator from defense counsel's office came to see him in Cook County jail. Brown testified that first the investigator, a black man, came to speak to him. Then the investigator came a second time, with a woman and the typed affidavit, and that is when Brown signed it and it was notarized. Brown stated that the information in the affidavit was the same as his testimony at the evidentiary hearing.

Brown testified that defendant's counsel at the hearing came to visit Brown on September 13, 2008, and that he related substantially the same information that was contained in the affidavit. Brown also identified a letter which he mailed in October 2008, in which he expressed concerns about testifying in defendant's case because it might hinder him from finishing work on his own postconviction appeal.

Brown testified that in October 2008, he also had an interview with a male assistant State's Attorney and a female investigator. Brown identified the assistant State's Attorney, as the one in court at the evidentiary hearing, and the same one who had visited him. During the interview, Brown stated that he did not want anything to do with defendant's case because he was working on his own postconviction appeal. The investigator stated that she might be able to help Brown with his case, and "that sparked up a little conversation and [Brown] told them what they wanted to hear." The investigator told Brown that she could help him "get good investigators for to find my witnesses." Also Brown asked the attorney if he would have "to go and testify and all that, and he was like, well, this might help you get out of it."

Brown then told them that he had made up the information in the affidavit. On the 2005 affidavit, he handwrote: "This statement is not true. I don't want to get

11

involved. I was upset about my case and this affidavit was my response."

On cross-examination, Brown denied ever telling the assistant State's Attorney that he was not present at the shooting. On redirect, Brown stated that Josh Cole and the victim exchanged words in school over a girl. Brown was the one who diffused the situation at that time. However, this exchange was the reason for the subsequent gang fight. Joshua Cole was present at that subsequent fight, when the victim was shot. After Brown's testimony, the hearing was continued in anticipation of Joshua Cole's testimony.

On April 16, 2009, defense counsel informed the court that Cole had provided an affidavit that was attached to defendant's postconviction petition in which Cole recanted parts of his trial testimony. However, between the last court date in February 2009 and this court date in April 2009, the assistant State's Attorney and an investigator had visited Cole, and Cole now denied the accuracy of his affidavit.

### b. Cole's Testimony

On April 16, Joshua Cole testified that he was convicted of another murder and sentenced to 40 years, and that he had a postconviction appeal pending. When asked if he was present at the shooting of the victim, Cole asked the judge if he

could invoke his fifth amendment right not to testify. The trial court then continued the hearing, so that Cole's attorney could be present.

On May 19, 2009, Joshua Cole testified as part of an agreement that he would not be questioned about his pending criminal case. Cole testified that he was not present on November 25, 1995, when Keith Lewis was killed. Cole testified that, in April 1996, the police brought him to a police station for questioning about the Lewis murder, after "a dude that I went to school with, he told the police he has seen me at the crime scene with a gun." The police informed him that a witness had said that he was at the crime scene. The police then told him that he could "be the defendant or [he] can be the witness." Cole's reaction was that he "wasn't going to let them charge [him] with murder." The police then told him "some things to say."

Cole testified that the witness who placed him at the scene said that the altercation "initiated from school for [Cole] and him, and it just took off to the streets." However the police wanted him to say the fight was over drugs and that defendant was "to take care of some business." Cole testified that, when he was questioned in April 1996 by the police, he was only 16 years old, and neither his mother nor a juvenile case worker was present.

Cole admitted that, before the grand jury, he testified that he saw defendant

13

immediately before the shooting and shortly after. However, he denied telling the grand jury that he saw defendant with a gun. In 1997, before Cole testified at defendant's trial, an assistant State's Attorney told Cole that he had "to repeat" what he had said in front of the grand jury, and then he was "free to go."

Cole testified that he signed an affidavit in October 2000 which stated "I'm not really sure w[h]ere I was that day or if I even saw [defendant] Anthony English on November 25, 1995." Cole testified that paragraph was true.

On cross-examination, Cole testified that he was not present when Lewis was killed, so therefore he does not know who was there. However, Cole admitted that he had previously told the police, the grand jury and the petit jury that he had seen defendant both before and after shots were fired. Cole stated that, when the assistant State's Attorney and the investigator visited him in March 2009, they let him read a police report describing an interview with William Brown, and they told him that Brown was trying to make it look like Cole was the murderer. He testified that they informed him that Brown was going to sign an affidavit saying that Cole killed the victim and that the defense "was trying to make it look like [Cole] killed the victim."

Cole testified that he then wrote across the bottom of the affidavit: "Mr. P.D,

you and your client are trying to feed me to the wolves yet require my help. Sorry, I'm not interested in anything or what you have to say. I don't remember reading this until 3/18/09. This is not true." Cole testified that he signed it. On redirect, Cole testified that he wrote that note when the assistant State's Attorney asked if he would like to write a note to the public defender.

### c. State's Evidence

After the defense rested, the State called Margaret Bamford, the investigator who was present at Cole's interview in March 2009. Bamford stated that Cole disagreed with the information provided by William Brown, and he was unhappy about it. Cole was provided with a transcript of his grand jury testimony; he reviewed it and stated that it was accurate and that it was also what he had said at trial. When Cole was shown his affidavit, he indicated that some of it was true and some was false.

Bamford also testified that she was present at the interview of William Brown on October 28, 2008. Bamford testified that Brown repeatedly, and throughout the interview, stated that he had no personal knowledge about the murder of Keith Lewis. Bamford also testified that Brown read his 2005 affidavit, and he stated it was false. Brown explained that, at the time of the affidavit, he was upset with the

15

State about his own case and he saw the affidavit as a way of "getting back at the State." Brown wrote across the bottom of his affidavit: "This statement is not true. I don't want to be involved. I was upset about my case and this affidavit was my response." Bamford denied offering to help Brown with his own postconviction appeal.

## ANALYSIS

On this appeal, defendant claims that the trial court's third-stage dismissal of defendant's postconviction petition was against the manifest weight of the evidence, where defendant presented the testimony of a new event witness, as well as the recanting testimony of an event witness who had originally testified for the State at defendant's trial. For the reasons discussed below, we affirm the trial court's dismissal.

### 1. Standard of Review

At a third-stage evidentiary hearing, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006) (citing *People v. Coleman*, 206 Ill. 2d 261, 277 (2002)).

When a petition is advanced to a third-stage evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a circuit

16

court's decision unless it is manifestly erroneous. *People v. Beaman*, 229 Ill. 2d 56, 72 (2008); *Pendleton*, 223 Ill. 2d at 473 (citing *People v. Childress*, 191 Ill. 2d 168, 174 (2000)).

However, if no fact-finding or credibility determinations were necessary at the third stage, *i.e.*, no new evidence was presented and the issues presented were all pure questions of law, we would then apply a *de novo* standard of review, unless the judge who presided over the postconviction proceedings had some special expertise or familiarity with defendant's trial or sentencing and that familiarity has some bearing on the disposition of the postconviction petition. *Beaman*, 229 Ill. 2d at 72; *Pendleton*, 223 Ill. 2d at 473 (citing *People v. Caballero*, 206 Ill. 2d 65, 87-88 (2002)).

In the case at bar, since new evidence was presented at the evidentiary hearing and the trial court was required to make credibility determinations, our standard of review is the manifest-error standard.

### 2. Stages of a Postconviction Proceeding

The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2000)) provides a means by which a defendant may challenge his or her conviction or sentence for violations of federal or state constitutional rights. *Pendleton*, 223 Ill.

2d at 471 (citing *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005)). To be entitled to postconviction relief, a defendant must show that he or she has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. 725 ILCS 5/122-1(a) (West 2000); *Pendleton*, 223 Ill. 2d at 471 (citing *Whitfield*, 217 Ill. 2d at 183).

The Act provides for three stages, in noncapital cases. *Pendleton*, 223 Ill. 2d at 471-72. At the first stage, the trial court has 90 days to review a petition and may summarily dismiss it, if the trial court finds that the petition is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2000); *Pendleton*, 223 Ill. 2d at 472. If the trial court does not dismiss the petition within that 90-day period, the trial court must docket it for further consideration. 725 ILCS 5/122-2.1(b) (West 2000); *Pendleton*, 223 Ill. 2d at 472.

The Illinois Supreme Court has held that, at this first stage, the trial court evaluates only the merits of the petition's substantive claim, and not its compliance with procedural rules. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). The issue at this first stage is whether the petition presents " ' "the gist of a constitutional claim." ' " *Id.* at 42 (quoting *People v. Boclair*, 202 Ill. 2d 89, 99-100 (2002), quoting *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). As a result, "[t]he petition may not be

No. 1-09-1449

dismissed as untimely at the first stage of the proceedings." *Perkins*, 229 Ill. 2d at 42.

In the case at bar, defendant's petition proceeded to the second stage. The Act provides that, at the second stage, counsel may be appointed for defendant, if defendant is indigent. 725 ILCS 5/122-4 (West 2000); *Pendleton*, 223 Ill. 2d at 472. After an appointment, Supreme Court Rule 651(c) requires the appointed counsel: (1) to consult with petitioner by mail or in person; (2) to examine the record of the challenged proceedings; and (3) to make any amendments "that are necessary" to the petition previously filed by the pro se defendant. 134 Ill. S.Ct. 651(c) (eff. Dec. 1, 1984); *Perkins*, 229 Ill. 2d at 42. Our supreme court has interpreted Rule 651(c) also to require appointed counsel "to amend an untimely *pro se* petition to allege any available facts necessary to establish that the delay was not due to the petitioner's culpable negligence." *Perkins*, 229 Ill. 2d at 49.

The Act provides that, after defense counsel has made any necessary amendments to the petition, the State may move to dismiss it. *Pendleton*, 223 Ill. 2d at 472 (discussing 725 ILCS 5/122-5 (West 2000)). See also *Perkins*, 229 Ill. 2d at 43. If the State moves to dismiss, the trial court may hold a dismissal hearing, which is still part of the second stage. *People v. Coleman*, 183 Ill. 2d 366, 380-81

19

(1998). A trial court is foreclosed "from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding." *Id.* at 380-81. In the case at bar, the trial court originally dismissed defendant's petition at the second stage, but the appellate court reversed and remand for a third-stage evidentiary hearing.

At a third-stage evidentiary hearing, the trial court "may receive proof by affidavits, depositions, oral testimony, or other evidence," and "may order the petitioner brought before the court." 725 ILCS 5/122-6 (West 2000).

### 3. Not Against Manifest Weight

Defendant's sole claim on this appeal is that the trial court's dismissal was against the manifest weight of the evidence, in light of Brown's new testimony and Cole's recanting testimony

The "manifest weight" standard is a "deferential standard of review," and our deference to the trial court "is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). For the reasons discussed, we find that the trial court's ruling, which was based almost exclusively on a credibility

No. 1-09-1449

determination, was not against the manifest weight of the evidence.

First, as the trial court observed, both Brown and Cole had provided different and contradictory versions of the day's events, at different times. Second, Brown's testimony appears to implicate Cole in the shooting, which Cole vehemently denies. Third, we remanded for the specific purpose of allowing the trial court to make a credibility determination,[2] and the trial court did just that, finding neither Cole nor Brown to be credible. For these reasons, we cannot find that the trial court's ruling was against the manifest weight of the evidence.

## CONCLUSION

For the reasons discussed above, we find that the trial court's ruling was not against the manifest weight of the evidence, and thus we affirm the trial court's

---

[2]In our prior order, dated October 26, 2007, we stated "our holding is limited to the conclusion that defendant is simply entitled to an evidentiary hearing regarding Brown's affidavit. Because the credibility of witnesses is a determination within the discretion of the trial court (*People v. Calderon*, 336 Ill. App. 3d 182, 197 (2002), whether the information in Brown's affidavit [would have] affected the jury's verdict is the precise issue to be determined at the evidentiary hearing." *English II*, No. 1-05-2287, order at 8.

dismissal of defendant's postconviction petition.

Affirmed.