2023 IL App (1st) 221036-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
August 29, 2023

No. 1-22-1036

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 97-CR-23668 |
| | ) | |
| LEON FIELDS, | ) | The Honorable |
| | ) | John Fitzgerald Lyke, Jr., |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Ellis and Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held:* Trial court's order denying postconviction relief following a third-stage evidentiary hearing on petitioner's actual innocence claim is affirmed.

¶ 2     The petitioner, Leon Fields, appeals from the denial of his consolidated successive petitions for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)) following a third-stage evidentiary hearing on his claim of actual innocence. We affirm the trial court's order.

¶ 3                                    I. BACKGROUND

¶ 4                                        A. Trial

¶ 5    This court has set forth the evidence from petitioner's trial in two prior decisions and thus summarize only that which is necessary to an understanding of this appeal. The State's evidence included the testimony of two eyewitnesses, Deron James and Curtis Hood, who both identified petitioner as one of the shooters. The State also presented other-crimes evidence showing that one of the guns used in the shooting matched a gun used in an earlier, unrelated shooting of Michael Welch, who testified that petitioner had shot him in that earlier incident. (At the time of trial, petitioner's case involving the shooting of Welch had not yet gone to trial.) Petitioner's defense case included the testimony of an alibi witness, Mary Taylor, and the testimony of defense investigators, Mort Smith and Felicia Smith, that Curtis Hood had provided a pretrial statement which recanted his prior identification of petitioner to police. Petitioner was tried with a codefendant, Rodney Toney, in a severed but simultaneous trial in which Toney was acquitted while petitioner was convicted. Deron James and Curtis Hood were both convicted felons and members of the Four Corner Hustlers gang. However, their testimony at trial was that they, along with Derryl Hood, had stepped back from the gang as of the time of the shooting.

¶ 6    The evidence established that on July 19, 1997, at about 11:30 p.m., Derryl Hood, Curtis Hood, and Deron James were outside of the Chateau nightclub on Madison Street in Chicago. Deron James, who was confined to a wheelchair, testified that he heard Curtis Hood say "look out, here comes Shorty Light Skin," which was petitioner's nickname. James then turned around to look behind him and saw petitioner, Toney, and a third "figure" whom he could not identify. He immediately saw Derryl Hood's arm come toward him and knock him out of his wheelchair. He heard gunfire and saw "fire coming from the guns." He then saw Derryl Hood on the ground, attempting to get up, when petitioner ran over to Derryl Hood and shot him from about five or six feet away. James heard two gunshots. James moved toward Derryl in an attempt to help him, but

Derryl was unresponsive and died shortly thereafter. The following day, James identified petitioner as one of the shooters from photographs shown to him by the police. He identified petitioner in a lineup the following month. James identified petitioner in open court as the man he knew by the nickname "Shorty Light Skin." He explained that he had met petitioner on one prior occasion earlier in 1997 when they had ridden in a car together. When they met, they had shaken hands using a handshake that Four Corner Hustlers used to recognize one another.

¶ 7        Curtis Hood testified that he was standing on the sidewalk that night when he felt the presence of five men come up behind him. He turned around and saw people with guns, including petitioner, Toney, and other people whom he could not identify. Curtis testified that he had known petitioner for a few years because they were both Four Corner Hustlers from the same area of the city, and he identified petitioner in open court. Curtis then said to Derryl and James, "it's a hit, they got us." He then saw petitioner and Toney open fire, and he saw Derryl dive to knock James out of the wheelchair. He next saw petitioner walk over to Derryl Hood and shoot him twice, in the face and neck. This occurred as Curtis was running was running east, toward his mother's home. He testified that somebody chased him, and he fell down after being shot in the knee. He was put into a car and taken to the hospital. There he spoke with detectives and identified petitioner as the shooter. About two weeks later, he also identified petitioner in a lineup at a police station.

¶ 8        In April of the following year, Curtis Hood signed a statement recanting his identification of petitioner as one of the shooters. He testified, however, that he did this only as a result of being taken at gunpoint to do so by a man Curtis Brown. He testified that on April 15, 1998, Curtis Brown had taken him at gunpoint to a McDonald's restaurant near his home where he met with Mort Smith, an investigator working for petitioner's defense counsel. Another lady was also there who said she was Smith's partner. He testified that Curtis Brown had sat with them and held the

gun to Hood's side throughout the time he spoke with the investigators and ultimately signed the statement. He did not inform either of the investigators that Brown was holding the gun to his side.

¶ 9        Curtis Hood's statement was admitted into evidence. It recited that he had named petitioner as one of the shooters because he had a "beef" with him and felt that blaming him for the shooting was an opportunity to get back at him; however, he had gotten a good look at the shooters' faces while he was on the ground and saw petitioner was not among them. In his trial testimony, Curtis Hood stated that the statement which the investigators had him sign that day was not the truth. He testified that he had signed it out of fear for his safety and the safety of his mother. He testified that, after the incident with Curtis Brown occurred, he called the detectives and told them about it. He testified that he had signed a complaint against Curtis Brown for intimidation, and he was the victim in a separate criminal case pending against Curtis Brown for aggravated intimidation. (Subsequent to this trial, Curtis Brown was found not guilty of the charges in the case against him.)

¶ 10       A forensic investigator with the Chicago Police Department, Carl Brasic, testified that he recovered a total of ten 9-millimeter and five .380-caliber cartridge casings from the crime scene. A firearms examiner then working for the Illinois State Police, Lisa Peloza, testified that based on her examination of the recovered firearm evidence, at least two separate 9-millimeter handguns and one .380-caliber handgun were involved in the shooting. She testified that a 9-millimeter handgun used in this shooting had also been used in a prior shooting involving a victim named Michael Welch, on January 11, 1997. This was based on her workup showing that eight of the sixteen recovered 9-millimeter cartridge casings from the Welch shooting matched four of the recovered 9-millimeter cartridge cases from the shooting at issue.

¶ 11       Welch testified as an "other crimes" witness. He is also a convicted felon. He testified that on January 11, 1997, he was talking on the phone in a game room when his friend tapped him on

the shoulder and pointed. Welch turned and saw petitioner coming toward him with a gun, shooting at him. He identified petitioner in open court as the person who had shot him that day. Welch ran and took cover behind a pool table, at which point petitioner left, got into a car, and drove away. Although Welch contacted the police immediately, it was not until February 1998 that he identified petitioner from a photo array and in a lineup. Welch testified that petitioner was not someone he had ever seen prior to the day of the shooting. Subsequent to this trial, petitioner was acquitted of charges arising out of the shooting of Welch.

¶ 12    In its case, the defense called Mort Smith and Felicia Smith, the two investigators who had obtained Curtis Hood's statement in April 1998. Mort Smith testified that, after speaking with Curtis Hood at the McDonald's restaurant, he had written out a statement for him to sign, the substance of which was that petitioner was not one of the shooters on the night of the incident. The statement, which was published to the jury, stated that Curtis Hood had blamed petitioner because he was angry with him and felt that blaming him for the shooting was an opportunity to get back at him. Mort Smith testified that he knew Curtis Brown and that Curtis Brown was not present at the McDonald's restaurant that day. Felicia Smith testified that, when she and Mort Smith first arrived, Curtis Hood was sitting in a booth next to an African American male who ordered some food and left. She testified that Curtis Hood was relaxed while providing his statement.

¶ 13    Petitioner's final witness was Mary Taylor, an alibi witness. She testified that between 10:30 p.m. and 1:30 a.m. on the night of the shooting, she was sitting on her porch with petitioner, her children, and her grandchildren. She testified that petitioner was on the porch with her the entire time and that they had "a long conversation about his life." She also saw petitioner again the next morning at a store. She testified on cross-examination that, when she learned petitioner had been arrested, she did not call the police to tell them that he was with her on the night of the shooting.

¶ 14　　　　The jury found petitioner guilty of first-degree murder and attempted murder. He was sentenced to 60 years for the murder conviction and 20 years for the attempted murder conviction, to run consecutively. This court affirmed his conviction and sentence on direct appeal. *People v. Fields*, 332 Ill. App. 3d 1135 (2002) (unpublished order under Illinois Supreme Court Rule 23), *petition for leave to appeal dismissed*, 202 Ill. 2d 681 (2003).

¶ 15　　　　　　　　　　　　　　B. Postconviction proceedings

¶ 16　　　　In 2005, petitioner filed his first postconviction petition, alleging that the State had committed a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). This court affirmed the trial court's first-stage dismissal of that petition. *People v. Fields*, 375 Ill. App. 3d 1138 (2007) (unpublished order under Illinois Supreme Court Rule 23).

¶ 17　　　　In 2011, petitioner sought leave to file the first of two successive postconviction petitions involved in this case. This petition, filed *pro se*, was supported in part by an affidavit from Renee Fitzgerald. Leave to file was granted, and petitioner, through retained counsel, filed an amended petition raising a claim of actual innocence supported by a new affidavit from Fitzgerald. In that affidavit, set forth in detail in *People v. Fields*, 2020 IL App (1st) 151735, ¶¶ 19-24, Fitzgerald's stated in summary that she was present on the night of the shooting and had seen "four dark-skinned adult men walk by armed with guns" a few second before hearing gunshots; she had later falsely and unwillingly identified petitioner to the police as the shooter, despite him being light-skinned and youthful, due to the detectives' repeated harassment and threats that her children would be taken from her by the Department of Children and Family Services (DCFS) if she did not cooperate by identifying petitioner as the shooter. The trial court dismissed this petition at the second stage, and petitioner appealed.

¶ 18　　　　While that petition was pending, in 2017, petitioner filed a *pro se* motion for leave to file a

second successive postconviction petition, which also raised an actual innocence claim. It attached an affidavit from a witness named Crystal Johnson, stating that while she was talking with people on the sidewalk, "about 4 guys in dark clothes walked by with guns and started shooting," that she knew petitioner from the area, and that she was "100% certain that [petitioner] wasn't one of the shooters that I saw walking on the sidewalk that night." See *id.* ¶ 26 (setting forth affidavit in detail). The trial court denied petitioner leave to file, and petitioner again appealed.

¶ 19        The two appeals were consolidated. This court reversed both decisions and remanded for a third-stage evidentiary hearing involving both petitions to consider the new testimony of both Fitzgerald and Johnson. *Id.* ¶ 63. This evidentiary hearing occurred in January and February 2022, and the testimony of the two witnesses is set forth below.

¶ 20                              *1. Testimony of Crystal Johnson*

¶ 21        Johnson testified that on July 18, 1997, she had been 20 years old. At about 11:30 p.m. that night, she was outside the nightclub talking to friends when she saw four men walk past her. Two of the men were her complexion, which she describes as "caramel," and that the other two were darker. She described them as "full-body men" who were tall. They "looked like they may have been locked up," by which she meant they looked big. She testified that she did not recognize them or notice their faces, "just complexions and body shapes." Shortly thereafter, she heard someone yell, "They got a gun." She did not hear "it's a hit" or "there's Shorty Light Skin." Upon hearing this, she dropped to the ground and began to move away from the scene. Several seconds later, she heard gunshots. She was quickly put into a car and taken home.

¶ 22        Johnson testified that she did not know who committed the shooting, but she knew petitioner was not the shooter. She testified that the shooter was one of the four people who walked by her. She knew petitioner from seeing him in high school. She described his appearance as a teenager,

who was "[r]eally frail, small." His complexion was "light-bright," lighter than hers. She was asked if petitioner was one of the men she saw on the street immediately before the shooting, and she answered: "He was standing in the crowd with us, so no. I didn't—literally, I didn't see him. I didn't see anything that night informing him of anything." She testified that she is 100% certain that petitioner was not one of the men that walked past her on the street. She later testified that petitioner was nowhere near her that night. Johnson stated that nobody ever interviewed her about what happened that night. She testified that she first learned that petitioner had been convicted of the crimes related to the nightclub shooting approximately ten years after it occurred, during a conversation with her friend Tiffany Thomas at a family event.

¶ 23    On cross-examination, Johnson stated that she was talking when she saw the four men and that after she looked at them, she turned back around and continued talking to her friends. They did not stop walking, speak to her, or look at her. She was unable to provide a description of the men and did not keep her eyes on them as they walked past her. She stated, "[I]t was just a glance of mine and then I went back to what I was doing." She testified that she heard gunshots but did not see them. She did not see which of the people in the crowd, if any, pulled the trigger. She does not know whether anyone else joined the group of men after they walked past her.

¶ 24    She was questioned about her statement on direct examination that petitioner was standing in the crowd that night. She testified that she had misunderstood the question, and that had not been what she was trying to say. She was also questioned about how she knew that one of the four men who walked past her had done the shooting if she did not see it. She answered: "As soon as they went by, it was immediately. It's kind of like common sense. If my circle was standing there and we were having fun with enjoyment and the next thing were people walking past, and all of a sudden you hear they got a gun, that's how it went in my world."

¶ 25    She was questioned about the timeframe in which she had first become aware that petitioner had been convicted for the shooting. She testified that she had first learned in the 1998-2000 timeframe that he had gone to prison for the shooting, when she talked to her friend Tiffany Thomas at a family barbecue. She stated that she also had a second conversation with Tiffany Thomas, which occurred one to three years later. She was then questioned with regard to her affidavit in which she had averred that her conversation with Tiffany Thomas had taken place in December 2015:

> "During December of 2015, I got in contact with an old friend, Tiffany Thomas. We ended up talking about a childhood friend of hers and her family name Kerry who's in jail which they thought would be coming home soon.
>
> During our conversation, it became clear that she was speaking about the night at Mr. Lee's in the summer of July, 1997. I informed her that I saw the guys walk past me that night. It was 4 guys wearing dark clothing carrying guns. I also remembered who Kerry was because I used to see him around the area where I grew up. To make sure we were talking about the same Kerry, Tiffany had me look up a picture of Leon Fields (Kerry) on the Illinois Department of Corrections website. Leon Fields (Kerry) pretty much looked the same as he did approximately 20 years ago. After verifying his identity, I'm 100% sure that Kerry wasn't one of the shooters that I saw walking on the sidewalk that night on Madison Street between Laramie and LeClaire.
>
> My friend Tiffany Thomas contacted me later and asked me if I'd say what I saw in court. I told her that I would ***."

After being led through her affidavit, Johnson testified that December 2015 was the date of her first conversation with Tiffany Thomas. She then clarified that the conversation in December 2015

had to be her second conversation with Tiffany Thomas, with the first being around the 2004 timeframe when her son was born. She then stated that her affidavit indeed confirms that she had two conversations with Tiffany Thomas, citing the December 2015 conversation and the time that Tiffany contacted her later to testify in court. She testified that her affidavit had been prepared by a lawyer and presented to her for signature. Asked if she had spoken to that lawyer before signing it, she answered, "Vaguely. They called on the phone." No redirect examination occurred.

¶ 26                            *2. Testimony of Renee Fitzgerald*

¶ 27       Fitzgerald testified that she was 32 years old as of the night of the shooting. That night, she was sitting in the driver's seat of her car, parked outside the nightclub on Madison, waiting for her friend Peggy Green to come out of a liquor store. Other people were in the car with her, but she does not remember their names. The area was well light, and she had not been drinking. As she was waiting there, her attention was drawn to "four dark-complected, adult men were coming down the street skipping." She explained that it was "[l]ike a kid skips. They were skipping like you'd do hopscotch skip." They were not walking or running, just skipping. They were wearing dark pants and hoodies. The men were four abreast on the sidewalk, coming toward her in the direction of the nightclub. She could see their faces.

¶ 28       After she saw these men, "[t]hey all pulled guns out, and when they walked past me, then the shooting began and I ducked down in my car." She could see the guns. She heard a lot of shots but did not know how many. Asked if she saw the shooting, she answered, "I did not see the shooting." After the shooting stopped, she got out of the car to look for Peggy Green. There was a crowd around, and she noticed a man on the ground next to a wheelchair near her car. The police arrived, and an unknown person pointed at her and told the police that she had seen the shooting. The police immediately put Fitzgerald in handcuffs and arrested her. She asked them why they were arresting

her, and they said it was for disorderly conduct. Peggy Green was also arrested. They were taken in separate police cars to the police station.

¶ 29    There Fitzgerald was questioned about the shooting. She identified photographs of the two detectives that questioned her, Maher and Pallohusky. She testified that they printed out four photographs but put only one in front of her. That then said to her "that they didn't care if I saw it, they needed a witness and that witness would be me." She was shown an exhibit, which she identified as a copy of the photograph they had placed in front of her. She testified that they asked her to study that photograph and to identify the person in it as the shooter. She told them no, that the person in the photograph had not been the shooter. The person in the photograph had a lighter complexion, and the men she saw had all been dark adult men. She testified that when she said this to the detectives, they became upset. "One called me a b*** and one squeezed my arm."

¶ 30    After not making an identification at the police station, she was taken to her car and went home. Later the two detectives found her again and asked her to follow them to the police station, "that I was going to testify for them whether I liked it or not." She went to the police station numerous times. She testified that she continued to refuse to falsely identify the person in the photograph as one of the shooters. Eventually, however, she "told them what they wanted to hear" and identified the person in the photograph as one of the shooters, even though this was untrue. She testified that the detectives made threats that, if she did not testify for them, her children would be taken away from her. They knew she had a DCFS case, and, shortly after these threats occurred, her children were in fact taken from her. The police blocked the streets and allowed DCFS to come and take her son and daughter. DCFS never gave her a reason why her children were taken from her, and she does not know whether the police had anything to do with it.

¶ 31    Fitzgerald testified also that in 1998, an investigator named Mort Smith came to her mother's

house and questioned Fitzgerald there. After speaking with her, Smith prepared a written statement for her to sign. She testified that she did not study or review it, she just signed it. She explained that she just wanted the experience to be over, that she felt rushed and just wanted to get it done. Shortly after, she left Illinois and moved to a women's shelter in Minnesota until 2002. While there, she received a subpoena to testify at petitioner's trial, but she ignored it.

¶ 32       She explained that she did not learn of petitioner's conviction until 2009, when she attended a repass for a friend. There she talked to a group of people that turned out to include petitioner's mother. She testified that on a later date, petitioner's mother had asked her to talk to the family's lawyers. In 2011, she met with lawyers for petitioner and eventually signed multiple affidavits concerning the events she witnessed on the night of the shooting. She testified that she had briefly reviewed the details of these affidavits but had not studied them.

¶ 33       On cross-examination, Fitzgerald testified that she was not questioned by the police at the scene prior to being transported to the police station. She was questioned about the detectives' having four photographs but only showing her one. At first, she testified that one of the detectives pushed one photograph in front of her but held the other four in his hands and never put them on any flat surface in front of her. Later, she testified that detective Pallohusky lined the photographs on the table and pushed only one forward toward her. She testified that she was able to see part of the images on those other photographs.

¶ 34       She testified that the detectives asked her questions before about what she had seen before she was shown the photograph. She told them that she did not know who the shooter was. She did not know how long into the detectives' questioning of her that they became upset with her.

¶ 35       She was questioned about the written statement she gave to Mort Smith on March 8, 1998. She knew that he was working on behalf of petitioner, although she did not know then what

petitioner was charged with. She testified that Smith had not really given her the opportunity to look at what he had written, but instead she just reviewed and signed it. She did not study it. She agrees that each of its four pages recites, in her own handwriting and above her signature, that she read the page and that it is true.

¶ 36     She agreed it contained no mention that she saw four men with guns pass her car. Asked if the statement said that she was "not paying attention to what was going on around her," she answered that she was paying attention and did not recall the statement. She answered that she did not know why Smith had written the statement as he did, but she did say that she saw the shooters. She agreed, however, that the statement did not say that she saw the shooting. She agreed it did not state that she saw anybody with a gun before the shooting. She reaffirmed her testimony on direct examination that she had not been drinking at all that night; she was then directed to a portion of her statement which said she was having difficulty breathing at the police station because "she had been drinking Alize, a drink that contains cognac and fruit juices." She stated that this was not a true statement, and Peggy Green was the one who had been drinking. She testified that she could not remember whether the statement states that she ever identified anybody to the police. She disputed that her statement to Smith had been that she "kept telling the police that she did not see anything," but rather she testified that she told him that she did not know who the shooters were. She also acknowledged that she did not mention to Smith that a detective had squeezed her arm.

¶ 37     She was next questioned about her first affidavit in this case, dated March 19, 2011. She agreed it does not mention a police officer squeezing her arm. Asked if it was true that her affidavit does not state that she identified anybody to police, she answered that she did not read it. She did not know whether it states that she broke down and identified a photograph of petitioner or identified him in a lineup. She stated that the affidavit was typed by somebody else, and she did

not remember how it came into her possession to sign. She did not remember discussing what was in it with anybody before she signed it. She did have a conversation with somebody about giving this affidavit but does not remember who that was.

¶ 38    The examination next turned to the second affidavit that she signed in this case, which was dated June 29, 2011. She was asked if it stated anything about any police officer doing anything to her arm, she answered that she did not know and had not read it. The court then interjected the following line of questioning:

"THE COURT: I have a question. Did you ever read that? Ever?

THE WITNESS: The first time I—

THE COURT: Answer my question. Yes or no, did you ever read that statement ever?

THE WITNESS: I read it the first time. I didn't—I viewed it. I didn't read—I didn't study the statement.

THE COURT: I didn't ask that. Did you ever read it?

THE WITNESS: I didn't proof it.

THE COURT: That's not my question. It's a very simple question, ma'am. Did you ever read it? R-e-a-d.

THE WITNESS: I just signed the statement, sir."

¶ 39    She was next questioned about her third affidavit in this case, dated October 17, 2013. She could not remember if she mentioned in it that an officer had grabbed her arm.

¶ 40    She was then examined concerning the threats allegedly made by the detectives involving DCFS taking her children if she did not identify petition as the shooter. She testified that a DCFS case was pending at the time this shooting happened, and her children were taken shortly after that. She testified that DCFS never gave her a reason why her children were taken away from her. She

was questioned at length on her efforts to ascertain the reason why her children were taken by DCFS, at which point the court again interjected:

"THE COURT: Court's question, did you ever find out why they took your kids?

THE WITNESS: I did find out.

THE COURT: What was that reason?

THE WITNESS: One of the ladies had told me that she quit the job because they were not fair to me. I went through a two-year program.

THE COURT: That wasn't my question. My question was *** why did they tell you they took your kids?

THE WITNESS: Because I wasn't supposed to be living there, I guess. What DCFS had just told me the day before, that it was fine, everything was fine there.

THE COURT: I'm going to ask it one more time. What was the reason they told you they took your kids? Period.

THE WITNESS: They did not—

THE COURT: They never told you?

THE WITNESS: They adopted my child.

THE COURT: What?

THE WITNESS: They adopted my child off. They did not give me a reason why they would not give me my kid back.

THE COURT: But did they give you a reason why they took them?

THE WITNESS: There was no reason why they should have taken my kids."

¶ 41    Finally, she was questioned about the subpoena she received to testify at petitioner's original

trial. She testified that when she received, she called the number listed on the subpoena "and told them I was not going to come and do what they wanted me to do." She said that she was not going to falsely identify anybody. She did not come to petitioner's trial to testify in any way. No redirect examination of Fitzgerald occurred.

¶ 42                                                *3. Trial Court's Order*

¶ 43        Following the evidentiary hearing, the trial court denied petitioner's postconviction petition. This was based principally on its finding that both Johnson and Fitzgerald had given testimony "filled with glaring credibility issues that rendered their testimony completely unreliable." While the trial court found that the testimony of both witnesses qualified as newly discovered, material, and noncumulative, it found that neither witness had provided testimony of a conclusive character likely change the result on retrial.

¶ 44        The court first discussed Johnson, setting forth five reasons why it did not find her testimony conclusive. The first was that she did not observe the shooting. Although she noticed the four men walk past her, she testified that she did not think anything of it at first and went back to talking to her friends. She did not continue looking at the four men, and she dropped to the ground and began moving away from the scene when she heard somebody yell about a gun. Thus, the trial court found, although she assumes that the four unidentified men committed the shooting based on how quickly it started after the men walked past her as well as their stature and size, this is speculation.

¶ 45        The second reason was the inconsistency between Johnson's affidavit, which states that she observed four men "carrying guns," and her testimony, in which she never mentioned seeing the men carrying guns. The trial court found that the omission of this "salient piece of evidence" from her testimony in court led to the conclusion that it is unlikely these men were carrying guns, causing it to find her testimony unconvincing that the four men were the actual shooters.

¶ 46    The third reason was her testimony that she was certain that petitioner was not the shooter, even though she did not see the shooting. The court reiterated that it found her assertion unconvincing that she knew the four men were the shooters based on the timing of the gunshots after they walked past her. It thus found, based on her testimony, that it is improbable that she knows that petitioner was not the shooter. The fourth reason involved her inconsistency about the timing of her conversation with Tiffany Thomas when she purportedly first learned of petitioner's conviction. She stated in her affidavit and on direct examination that this occurred in 2007; but on cross-examination, she placed it as early as the 1998-2000 timeframe to as late as 2015. The trial court found that her inability to recall when this conversation occurred called into question her ability to accurately recall the relevant events of this case. The final reason was her testimony that she did not type her affidavit, but rather it was "presented" to her after she "vaguely" spoke with a lawyer by phone regarding the case.

¶ 47    As to Fitzgerald, the trial court identified four principal reasons why it did not find her testimony conclusive. The first was that she clearly testified on direct examination, "I did not see the shooting." The second was the number of omissions and deviations between the statement taken from her in 1998 and the facts in her later affidavits and testimony. For example, her 1998 statement says nothing about her seeing four men or that they were carrying guns. Instead, it states that she was "listening to the radio and talking to one of the ladies who was sitting in the back seat" when the gunshots happened, and she "was not paying attention to what was going on around her." It also did not mention any threats allegedly made by the detectives to coerce her to falsely identify petitioner as the shooter. The court found that these were significant facts that she would have included in her 1998 statement if they were true. The court found that the fact that the 1998 statement was far closer in time to the event than any of her three affidavits written years later

warranted its placing greater weight and credibility on the facts set forth in that earlier statement.

¶ 48    The third reason involved her testimony that she did not read one of her affidavits before signing it. The court referenced its own exchange with Fitzgerald concerning whether she had read her June 2011 affidavit. It reasoned that her failure to read the June 2011 affidavit called into question whether she had read any of the affidavits before signing them. It stated that its concern was confirmed by Fitzgerald's testimony that there were discrepancies between what was set forth in the statement and affidavits and what had actually occurred, particularly the allegation that a detective squeezed her arm when she refused to make an identification.

¶ 49    Finally, the trial court cited her combative manner while testifying and her nonresponsive answers to questions on cross-examination. The court noted that she had been particularly defense and nonresponsive on the topic of the reason DCFS had taken her children. It noted, however, that she had raised a serious allegation concerning the integrity of the investigation in petitioner's case by alleging that the detectives were responsible for her children being placed with DCFS, an allegation which she was unable to substantiate.

¶ 50    In addition to its finding that the testimony of Johnson and Fitzgerald was not credible, the trial court also rejected several other arguments raised by petitioner in his petitions. This included arguments that he should be granted a new trial on the basis that Curtis Hood's testimony at trial deserved no weight, that Deron James' identification of petitioner was unreliable and should be rejected, that he was subsequently acquitted of the charges involved with the State's other crimes evidence, and that he provided a credible alibi witness at his original trial. The trial court concluded that these arguments merely amounted to a claim that the evidence presented at trial was insufficient to sustain his conviction and refused to relitigate that issue. It pointed out that the jury, after considering all the evidence at trial, had found the identification testimony of Curtis Hood

and Deron James to be more credible that than of petitioner's alibi witness. It also reasoned that the fact that petitioner was acquitted of the charges arising out of the other crimes evidence would not necessarily bar its use in a retrial. The trial court concluded by finding that petitioner "has not made a substantial showing of an actual innocence claim where the combination of the original trial evidence and Crystal Johnson's and Renee Fitzgerald's affidavits and their collective incredible testimony fail to undermine this Court's confidence in the judgment of guilt." Petitioner thereafter filed a timely notice of appeal.

¶ 51                                                    II. ANALYSIS

¶ 52        The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)) provides a means by which a person under criminal sentence may challenge his conviction or sentence by showing that, in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or the State of Illinois. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). A claim of actual innocence based on newly discovered evidence may be raised in a postconviction petition. *People v. Washington*, 171 Ill. 2d 475, 489 (1996).

¶ 53        In non-death penalty cases, postconviction actions are adjudicated in three stages. *People v. Domagala*, 2013 IL 113688, ¶¶ 32-34. This case involves the third stage, in which the trial court has denied the petition after conducting an evidentiary hearing. *Id.* ¶ 34. At a postconviction hearing, the burden of proof is on the petitioner to show a denial of a constitutional right by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. The trial court is the fact finder at the third stage and has the role of determining witness credibility, deciding the weight to be given to testimony and evidence, and resolving conflicts in the evidence. *Domagala*, 2013 IL 113688, ¶ 34. It then determines whether the evidence introduced entitles the petitioner to relief. *Id.* Where a trial court has held an evidentiary hearing in which it considered the petitioner's new

evidence and weighed the credibility of witnesses, the appellate court will reverse a trial court's judgment only if it is manifestly erroneous. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). Manifest error is that which is clearly evident, plain, and indisputable. *Id.*

¶ 54    To succeed on a postconviction claim of actual innocence, a petitioner must present evidence that is (1) newly discovered, (2) material and noncumulative, and (3) "of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. Here, the trial court found elements (1) and (2) satisfied but not element (3), concluding the new evidence of actual innocence was not conclusive. Petitioner's first argument on appeal is that the trial court erred in its analysis of this issue of conclusiveness. He argues that the trial court failed to adequately consider the evidence from his trial, particularly how weak it was, in determining whether a different result would be likely at a retrial. He cites *Coleman*, in which the supreme court explained that "conclusive" in this context means that "the evidence, *when considered along with the trial evidence*, would probably lead to a different result." (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 96. The consideration for a trial court is whether the new evidence "places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 97. The standard is one of probability, not certainty, because the trial court is effectively predicting what another jury would likely do if it considered all the evidence, both old and new, together. *Id.*; see *People v. Sanders*, 2016 IL 118123, ¶ 47 ("We must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable jury would find him guilty beyond a reasonable doubt.").

¶ 55    Petitioner argues that the trial court "completely ignored" the evidence from his trial when it denied his postconviction petition. He contends that the trial court should have evaluated and concluded that the State's evidence on retrial would be "weak and vulnerable." The reasons for

this conclusion, he argues, are that first, he was linked to the shootings only by the eyewitness testimony of Curtis Hood and Deron James, both of whom are involved and biased witnesses. He asserts that the testimony of both men would be "virtually worthless" at a retrial, since both men were gang members, convicted felons, and the victim's nephew and best friend, respectively. He also cites Curtis Hood's initial recanting of his identification of petitioner, which led this court to discount Hood's testimony in its earlier opinion. See *Fields*, 2020 IL App (1st) 151735, ¶¶ 57, 59 (characterizing Curtis Hood as "not the strongest witness" and stating on retrial that "the State would be relying primarily on the testimony of Deron James"). He also cites inconsistencies in the trial testimony about whether Curtis Hood yelled petitioner's nickname prior to the shooting, and to Deron James' claims that he recognized petitioner despite the fact that "[b]ullets [were] flying" and he was not "trying to find faces." He further cites the trial court's statement in acquitting Toney that the degree of attention of these witnesses "had to be consistent with the fact that they were scurrying to protect themselves" and that their opportunities to observe were diminished by "the shorter period of time and the stressful circumstances they were confronted with."

¶ 56    Second, petitioner contends that the other-crimes evidence involving the shooting of Welch would "likely have no impact on retrial" due to the fact that he was subsequently acquitted of the charges arising from that incident. He points out that this court's prior opinion stated that it was "questionable what impact [Welch's testimony] would have as other-crimes evidence at a retrial" in light of the subsequent acquittal, or whether it would even be admissible. See *id.* ¶ 57. Finally, petitioner contends that Taylor's alibi testimony that he was sitting on her porch with her, her children, and her grandchildren at the time of the shooting would remain uncontested at retrial. Petitioner contends that all of this evidence should have been taken into account by the trial court on the issue of the conclusiveness of the new evidence presented through Johnson and Fitzgerald.

¶ 57    We reject petitioner's argument and conclude that the trial court conducted the proper analysis called for by *Coleman* when it denied his postconviction petition. *Coleman*, 2013 IL 113307, ¶¶ 96-97. The trial court's order demonstrates that its ruling on the conclusiveness of petitioner's new evidence was based primarily on its finding that the testimony of both Johnson and Fitzgerald was "filled with glaring credibility issues that rendered their testimony completely unreliable." These findings that petitioner's new witnesses lacked credibility and gave unreliable testimony left the trial court with little reason to engage in a detailed discussion of the trial evidence or the effect of the new testimony on it. Instead, it is clear that the trial court properly focused on the new evidence and on whether that new evidence placed the trial evidence in a different light or undercut the court's confidence in the factual correctness of the guilty verdict. *Id.* ¶ 97; see *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 33 (focus of actual innocence claim is on the new evidence itself). It was the prerogative of the trial court to conclude, based the lack of credibility of the witnesses testifying, that it did not do so.

¶ 58    Further, the trial court's order demonstrates that it was fully aware of the trial evidence and expressly states that it considered it in combination with the new evidence in its analysis of conclusiveness. Its analysis specifically identifies the facts set forth above which petitioner identifies as weaknesses in that evidence. It concluded, in light of its determination that the new witnesses' testimony was not credible, that a postconviction actual-innocence claim could not be sustained by pointing to other weaknesses in the trial evidence. See *People v. Evans*, 2017 IL App (1st) 143268, ¶ 30 (an actual innocence claim does not merely challenge the strength of the State's case against the postconviction petitioner, and the sufficiency of the State's evidence is not a proper issue for postconviction proceedings). It noted that petitioner's trial had essentially presented a credibility contest between the identification testimony of Curtis Hood and Deron James and the

alibi testimony of Taylor; the jury heard all of this evidence, and it found the identification testimony to be more credible than the alibi testimony. The sufficiency of this evidence to sustain petitioner's conviction was affirmed on direct appeal, and the trial court properly stated that it would not relitigate the issue again. The trial court also correctly noted that petitioner's subsequent acquittal of the charges arising from the Welch shooting would not necessarily bar its use as other crimes evidence on retrial. See *People v. Baldwin*, 2014 IL App (1st) 121725, ¶ 73. Accordingly, we find no error by the trial court in the way it analyzed the trial evidence as part of its overall consideration of the conclusive character of petitioner's new evidence of actual innocence.

¶ 59       Petitioner's remaining arguments challenge the trial court's credibility findings concerning Johnson and Fitzgerald, and he urges this court to find that their testimony, when viewed in context with the weak evidence that would be presented on retrial, makes it probable that a jury would acquit him on retrial. This is a difficult challenge to mount on appeal, as credibility determinations associated with the question of conclusiveness of new evidence of actual innocence are recognized as being "uniquely appropriate for trial judges to make." *Coleman*, 2013 IL 113307, ¶ 97. This is due to the fact that "the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *People v. Coleman*, 183 Ill. 2d 366, 384 (1998) (quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)). Further, the manifest error standard of review requires the appellate court to give great deference to the trial court's factual findings due to its being in the best position to weigh the credibility of the witnesses who testify at the evidentiary hearing. *People v. Ruddock*, 2022 IL App (1st) 173023, ¶ 51; *People v. English*, 406 Ill. App. 3d 943, 953-54 (2010).

¶ 60       Upon considering the transcript of the evidentiary hearing and the record in its entirety, we

find no manifest error in the trial court's credibility determinations or in its conclusion that the new evidence presented by their testimony was not so conclusive as to likely change the result on retrial. The trial court's order provided a thorough explanation for its credibility determinations (see *supra* ¶¶ 44-49), and we find no clearly evident, plain, or indisputable error in its reasoning. Instead, we concur from our review of the record that both Johnson and Fitzgerald gave testimony that raised questions about the extent to which they actually observed salient events on the night of the shooting and accurately recalled the events of that night decades later.

¶ 61 The heart of petitioner's argument involves the trial court's finding that, because neither Johnson nor Fitzgerald actually saw the shooting itself, they could not credibly testify that petitioner was not the shooter. Petitioner argues that this conclusion "ignores the plethora of evidence that these shootings occurred in the location and at the time" that a group of four men in dark clothing approached the nightclub, something both witnesses testified they observed. He points out that Curtis Hood also described a group of men in dark clothes carrying guns and standing in a half-circle around him, and there was no evidence that anyone else dressed like these men joined the group in the seconds between when it passed the two eyewitnesses and when the shooting started.

¶ 62 We reject petitioner's argument. It is undisputed in this case that both Johnson and Fitzgerald admitted in their testimony that they did not actually see who fired a gunshot that night; thus, both witnesses were assuming that they knew who did and did not fire a gun that night, based on the timing of hearing gunshots shortly after seeing a group of four men with dark complexions pass by. The whole point of the hearing was thus for the trial court to evaluate, from the testimony of these two witnesses, whether each had made overall observations that night sufficient to justify her drawing of the conclusion that the shooter was part of that group of men, and not petitioner.

¶ 63    As to Fitzgerald, the trial court was fully justified in finding that she was not credible in her testimony that she saw a group of men that night with guns immediately before the shooting. Most significantly, the evidence showed that she had given a written statement to a defense investigator in 1998, within eight months of the shooting, in which she never mentioned seeing a group of men, with or without guns, of which the shooter had been part. Instead, her 1998 statement indicated that she had been talking to a backseat passenger in her car just prior to the gunshots and "was not paying attention to what was going on around her." While petitioner emphasizes that Fitzgerald did not choose what Mort Smith wrote in this statement, it was also undisputed that she had attested to the truth of what was written on every page of it. It was within the purview of the trial court to determine the weight to be given to this evidence and its effect on her credibility. *Domagala*, 2013 IL 113688, ¶ 34. It was further within the purview of the trial court to draw conclusions about her overall lack of credibility based on the various other discrepancies between her 1998 statement, her three later affidavits, and her testimony; from her evasive answers to questions about whether she had read what was stated in her affidavits; from the extent to which her testimony failed to substantiate the allegations of serious misconduct by detectives investigating this case; and from her "combative" demeanor while testifying. We find that the trial court's conclusions regarding her lack of credibility are consistent with the evidence and not manifestly erroneous.

¶ 64    With respect to Johnson, the trial court found that she was speculating when she testified that she knew petitioner was not the shooter and that the shooter had come from the group of four men that walked past her. It found from her testimony that her attention had not been sufficiently drawn to and remained on this group of men prior to the shooting for her to make this assertion with credibility. This conclusion was supported by the evidence, which showed that she was talking to her friends when she noticed the group of men. She stated on cross-examination that "[i]t was just

a glance of mine and then I went back to what I was doing," which was talking to her friends. She testified that she turned around and did not keep her eyes on the men as they walked past her. She had then dropped to the ground upon hearing someone yell "[t]hey got a gun" and had begun moving away from the scene prior to hearing gunshots seconds later. She testified she was then quickly put into a car and taken home. Further, we share the trial court's sentiment that Johnson's inability to recall when her conversation with Tiffany Thomas occurred "calls into question Johnson's ability to accurately recall the relevant events of this case." Petitioner argues her confusion on this issue is not grounds for rejecting her testimony on the ultimate issue. We disagree. In her testimony, Johnson gave wildly varying timeframes for this conversation in which she first learned petitioner had been convicted of the shooting. She first mentioned 2007, then stated it may have been as early as 1998 or as late as 2015, then stated it was around 2004. Her inability to recall whether she first learned of petitioner's conviction for the shooting within one year of it or 18 years later indeed calls into question how accurately she recalls the events of that night, and we find no manifest error in the trial court's finding that her testimony was not credible.

¶ 65    The case law makes clear that the requirement placed on a postconviction petitioner to provide "conclusive" new evidence in an actual innocence claim is a very high standard. See *Coleman*, 2013 IL 113307, ¶ 94 ("the standard we adopted is extraordinarily difficult to meet"). The trial court's conclusion that this standard was not satisfied in this case, inasmuch as the testimony of Johnson and Fitzgerald was not credible and did not place the original trial evidence in a different light or undermine its confidence in the guilty verdict, was not manifestly erroneous.

¶ 66                                III. CONCLUSION

¶ 67    The trial court's order denying postconviction relief is affirmed.

¶ 68    Affirmed.